Sandra J. HARTKE

v.

Dr. William McKELWAY, Appellant.

Sandra J. HARTKE, Appellant,

v.

Dr. William McKELWAY.

Nos. 81–2192, 81–2193.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 29, 1982.

Decided May 20, 1983.

As Amended May 20, 1983.

---

Vance Hartke, Falls Church, Va., for appellant in 81–2193 and cross-appellee in 81–2192. Wayne Hartke, Falls Church, Va., also entered an appearance for appellant/cross-appellee.

Patrick J. Attridge, Rockville, Md., for appellee in 81–2193 and cross-appellant in 81–2192.

Before MacKINNON and GINSBURG, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge McGOWAN.

McGOWAN, Senior Circuit Judge:

These cross-appeals arise out of the failure of an operation to sterilize the plaintiff, resulting in the birth of a healthy baby girl. The primary issue for our consideration in this diversity case is whether, under District of Columbia law, the plaintiff would be allowed to recover from the defendant doctor some portion of the expenses of raising the child to majority. We are also called upon to decide whether, in the light of certain language in our opinion in *Henderson v. Milobsky,* 595 F.2d 654, 657–58 (D.C. Cir.1978), patients in informed-consent cases must testify that they would not have undergone the procedure had they known of all the material risks involved. Finally, we must decide whether the risk of subsequent pregnancy in this case could reasonably have been considered material to a decision whether to undergo the treatment.

After a jury verdict for plaintiff on all claims, the District Court disallowed the award of childrearing expenses because it found the evidence clear that plaintiff had sought to be sterilized for therapeutic, not economic, reasons, and because she prized the child she bore. *Hartke v. McKelway,* 526 F.Supp. 97, 105 (D.D.C.1981). The court also held that *in haec verba* testimony of causation is not required to get the issue of informed consent to the jury as long as there is otherwise sufficient evidence from which the jury could infer that a patient would have declined the procedure had he or she known of the risks. *Id.* at 103.

Finding such evidence, the court upheld the jury's award of damages for plaintiff's medical expenses, pain, suffering, and mental anguish resulting from the pregnancy and childbirth. *Id.* The court also held that a jury could have found that a reasonable person in plaintiff's somewhat unusual position would likely have attached significance to the undisclosed risk of subsequent pregnancy here (one to three out of one thousand). *Id.* at 102–03. We affirm.

## I

In the winter of 1978, Sandra J. Hartke, the plaintiff in this action, discovered she was pregnant and elected to have an abortion. For reasons that are crucial to the disposition of this appeal, and that are discussed at length below, she also sought to have herself sterilized. Her usual doctor recommended a hysterectomy, the complete removal of the uterus. Hartke, then 33, thought this a rather drastic procedure, so she approached the defendant, Dr. William McKelway, for a second opinion. Dr. McKelway recommended a procedure known as laparoscopic tubal cauterization, which involves blocking the Fallopian tubes by burning them with instruments inserted through one or two small incisions in the abdomen. Hartke consented to the procedure, and on March 14, 1978, an abortion and tubal cauterization were performed on her. Dr. McKelway subsequently examined Hartke and termed the operation successful.

There was testimony from which the jury could infer that prior to the operation Dr. McKelway failed to disclose to Hartke that there was a risk of recanalization—where a Fallopian tube spontaneously reopens—of one to three out of one thousand. Hartke and her boyfriend, with whom she had lived for four years and whom she later married, also testified that the boyfriend offered to undergo a vasectomy if there was any risk of subsequent pregnancy, but that McKelway told them that the procedure was "a 100 percent sure operation," and that Hartke would not have to worry about becoming pregnant again. Record Excerpts (R.E.) at 33; *accord id.* at 34.

Despite the surgery, Hartke again became pregnant in September 1979. After an examination confirmed that the pregnancy was normal—she had had a tubal or ectopic pregnancy in 1968—she elected to carry it to term and in June 1980 gave birth by Caesarean section to a baby girl. At the same time, Hartke had herself resterilized by a tubal ligation, which involves actually cutting the Fallopian tubes. The record suggests that this method of sterilization involves about the same risk of subsequent pregnancy as cauterization. Transcript of July 23, 1981, at 145, 148 (testimony of Dr. Falk); *see also id.* at 148 (risk when ligation performed at time of delivery is greater). At the time of trial, one year after the delivery, she had not resumed sexual relations with her husband. Transcript of July 24, 1981, at 304 (testimony of Weddle (plaintiff's husband)); *see id.* at 296 (testimony of Mrs. Hartke (plaintiff's mother)).

Invoking the District Court's diversity jurisdiction, Hartke brought suit against McKelway alleging negligence in the performance of the cauterization procedure, failure to obtain informed consent, and breach of warranty. At the conclusion of the plaintiff's evidence, the District Court granted McKelway a directed verdict as to the breach of warranty claim; Hartke does not now complain of this ruling. The jury returned a special verdict, finding that McKelway negligently failed to cauterize Hartke's Fallopian tubes and that he failed to inform her of a material risk of the procedure. It awarded Hartke $10,000 in medical expenses, $100,000 for pain, suffering, and mental anguish, and $200,000 for the "[a]nticipated costs of raising this child until age 18 less any benefit [Hartke] received or in the future will receive by reason of the love, joy, happiness, etc. she experienced in raising a healthy, happy child." R.E. at 1–2; 526 F.Supp. at 106 (copy of special verdict form used).

The District Court granted in part McKelway's motions for judgment notwithstanding the verdict and for a new trial. It held that there was no evidence of medical

expenses greater than $6,000 and no evidence of future medical expenses, and ordered a new trial on this issue unless Hartke agreed to remit $4,000. *Id.* at 104. Hartke made such a remittitur.[1] The court also ruled that a new trial of the negligence claim would be necessary because one of Hartke's experts should not have been allowed to testify on the standard of care for laparoscopic cauterization. *Id.* at 101.[2] Finally, the court disallowed the award of childrearing expenses because the "weight of authority does not, and the District of Columbia courts would not, allow recovery of the costs of raising a healthy child in circumstances such as these where the plaintiff sought sterilization solely for therapeutic reasons, and prizes the child she bore." *Id.* at 105.[3] Both parties appealed.[4]

## II

We deal first with the judgment that Dr. McKelway failed to disclose material risks to Hartke.

### A. *Materiality of the Risk*

McKelway first argues that he had no duty to disclose the risks of pregnancy in this case since no "reasonable person in what the physician [knew] or should [have known] to be the patient's position would be likely to attach significance to the risks in deciding whether to accept or forego the proposed treatment," *Crain v. Allison,* 443 A.2d 558, 562 (D.C.App.1982). The risk of pregnancy after laparoscopic cauterization was testified to be one to three out of one thousand.

■ For present purposes, the crucial language in the above formulation is "what the physician [knew] or should [have known] to be the patient's position." The "patient's position" must include the patient's medical history and other factors that might make knowledge of certain risks particularly important to a certain patient, acting reasonably. Here, there were two factors that would make even a small risk of pregnancy unusually dangerous for a patient in Hartke's position. First, Dr. McKelway knew that Hartke had a history of gynecological and pregnancy-related problems. She had contracted ⌣peritonitis after the birth by Caesarean section of her first child in 1964, resulting in a lengthy and traumatic hospital stay. She had had

1. Hartke objects to this order of a new trial as unfair and unjustified. A plaintiff may not, however, appeal from a remittitur order that he or she has accepted. *Donovan v. Penn Shipping Co.,* 429 U.S. 648, 97 S.Ct. 835, 51 L.Ed.2d 112 (1977) (per curiam).

2. The District Court noted that since it upheld the jury's separate verdict on the informed consent issue, a new trial on negligence would actually be necessary only if its holding on informed consent were overturned on appeal. 526 F.Supp. at 102. Since we uphold the court's ruling on the informed consent issue, we need not reach Hartke's argument that the jury's verdict on negligence should have been allowed to stand, nor McKelway's argument that he should have been granted not a new trial but judgment notwithstanding the verdict on that issue.

3. The District Court also ruled that if its disallowance of the award of childrearing expenses were reversed on appeal, a new trial would be required on the amount of those damages because the only evidence on the question was Hartke's testimony that it had cost her about $60,000 to raise her first daughter to the age of 17. *Id.* at 105. Hartke now argues that the jury's verdict was reasonable and should be reinstated. Since we disallow the award of any childrearing expenses in this case, we need not reach this issue.

4. Hartke's notice of appeal was limited to "that part of the Order ... relating to the disallowance by the Judge of the Jury's Verdict awarding Two Hundred Thousand Dollars ($200,-000.00) for child rearing expenses." Appellee/Cross-Appellant's Appendix at 32. Since we do not reach the other issues now raised by Hartke, *see supra* notes 1, 2, & 3, we do not decide the effect of the limited notice of appeal. *Compare* Fed.R.App.P. 3(c) ("An appeal shall not be dismissed for informality of form or title of the notice of appeal.") *and* Advisory Committee Note to 1979 Amendment of Fed.R. App.P. 3(c) ("[S]o long as the function of notice is met by the filing of a paper indicating an intention to appeal, the substance of the rule has been complied with.") *with Gannon v. American Airlines,* 251 F.2d 476, 482 (10th Cir. 1957) (Under old Fed.R.Civ.P. 73(b), "the jurisdiction of this court on appeal is limited to the review of the judgment or portion thereof designated.").

an ectopic pregnancy in 1968, apparently begun while using an IUD. She had been hospitalized numerous times for minor gynecological procedures. Hartke testified she informed Dr. McKelway that other doctors had advised her she "would not make it through [another] pregnancy." Transcript of July 21, 1981, at 8. Second, Dr. McKelway had before him conclusive evidence of the psychological effect of pregnancy on his patient. He testified that she was "extremely upset" and "very agitated" about the pregnancy. Transcript of July 24, 1981, at 311. She testified that she told him she thought she was going to die from the pregnancy. R.E. at 23.

In sum, the jury could conclude that a subsequent pregnancy would be a very serious consequence for this particular patient, which would result possibly in physical and certainly in psychological trauma. This was underscored by the testimony that Hartke's boyfriend told the doctor he would undergo a vasectomy instead if the sterilization was not sure to be successful.

Moreover, less risky paths than relying on the cauterization were open to Hartke. Had she been able to compare the relative risks of failure, she might reasonably have changed her mind and decided to undergo a hysterectomy if, as the evidence suggested,[5] the latter procedure would have reduced the risk. Perhaps more likely given her ultimate course of conduct, even if Hartke had agreed to the cauterization, she might reasonably have decided to have her boyfriend undergo a vasectomy, abstained from intercourse, or taken other precautions that would reduce the risk.

In *Canterbury v. Spence,* 464 F.2d 772 (D.C.Cir.), *cert. denied,* 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972), this court noted in this connection, "Whenever nondisclosure of particular risk information is open to debate by reasonable-minded men, the issue is for the finder of the facts." *Id.*

at 788 (footnote deleted). There we held that the jury could have found a one percent risk of a very serious harm—permanent urinary incontinence and paralysis of the bowels—to be material to a decision whether to undergo an operation for back pain. *Id.* at 794. In *Henderson v. Milobsky,* 595 F.2d 654, 659 (D.C.Cir.1978), we held that a .001% risk of permanent loss of sensation in a small section of the face could not reasonably be deemed material to a decision whether to have impacted wisdom teeth removed. In this case, the undisclosed risk was a .1% to .3% chance of subsequent pregnancy. For most people, this risk would be considered very small, but this patient was in a particularly unusual position. In view of the very serious expected consequences of pregnancy for her—possibly including death—as well as the ready availability of ways to reduce the risk, we agree with the District Court that a jury could conclude that a reasonable person in what Dr. McKelway knew to be plaintiff's position would be likely to attach significance to the risk here.

### B. *Proximate Cause*

█ In order for there to be liability in tort, there must be both breach of duty—here, the failure to divulge a material risk—and proximate causation. McKelway argues that the issue of whether the failure to disclose the risk of subsequent pregnancy here proximately caused the harm should not have gone to the jury because Hartke had not testified that she would not have undergone the treatment had she known of the risks. The source of McKelway's argument is certain language in our opinion in *Henderson v. Milobsky,* 595 F.2d 654 (D.C. Cir.1978). Discussing the earlier case of *Haven v. Randolph,* 494 F.2d 1069 (D.C.Cir. 1974), the *Henderson* court wrote:

---

5. *Compare* Transcript of July 23, 1981, at 237 (Dr. Marlow) ("*surprisingly* . . . there have been a number of pregnancies" after hysterectomies) (emphasis added) *and id.* at 151 (Dr. Falk) (25 abdominal pregnancies have been reported in the literature) *with id.* at 148 (Falk)

(risk of pregnancy after laparoscopic sterilization is one to three or four per thousand) and *id.* at 236 (Marlow) ("I know of no series in the world where there have not be[en] failures following laparoscopic sterilization.").

*Haven* did not, however, add anything really novel to our jurisprudence on risk-disclosure. In result, it merely reemphasized the claimant's burden of showing that the alleged breach of duty to disclose led to the injury *for which compensation is sought.* In *Canterbury* we had held that when damages are sought for a condition attributed to a medical procedure, causation by breach of duty cannot be demonstrated simply by the claimant's unadorned hindsight-statement that had he known of the risk he would not have consented to the procedure. *Haven merely stands for the cognate proposition that when the claimant has not even made such an assertion, the issue of causation cannot possibly go to the jury.* 595 F.2d at 657–58 (emphasis added, footnote deleted).

The District Court rejected McKelway's argument, finding that *Henderson* should not be read to require *in haec verba* testimony from the plaintiff "as long as there is sufficient evidence from which the jury could infer that she would have refused." 526 F.Supp. at 103. The court held that to require such testimony in such a case "would only set a trap for the unwary." *Id.* Citing Hartke's husband's offer to undergo a vasectomy, the court found that there was evidence in this case "from which the jury could find that plaintiff would have declined the procedure had she been informed of the risks." *Id.*

■ In its ruling the District Court appears to have applied a standard of causation based on what Hartke herself would have done. This is inconsistent with the standard of causation adopted by this court in *Canterbury v. Spence,* 464 F.2d at 790–91. In that case the court held that the issue of causation should be resolved on an objective basis, "in terms of what a prudent person in the patient's position would have decided if suitably informed of all perils bearing significance." *Id.* at 791 (footnote deleted). The rule was based on a distrust of the patient's hindsight testimony that he

or she would have foregone the treatment. *Id.* at 790 (The patient's testimony "hardly represents more than a guess, perhaps tinged by the circumstance that the uncommunicated hazard has in fact materialized.") (footnote deleted). Such testimony was believed to be the primary, if not only, evidence on the question of causation in the usual case.

The District Court's confusion in this case—it charged the jury under a reasonable-person standard, Transcript of July 29, 1981, at 431—is understandable, because in both *Henderson* and *Haven,* issued after the *Canterbury* decision, this court appears to have applied a causation-in-fact rather than a reasonable-person standard. In *Henderson,* the court held that the plaintiff's testimony that he would not have undergone the procedure had he known of the risk of temporary paresthesià could not be believed because he did in fact continue the treatment once the paresthesia had appeared. 595 F.2d at 658; *see id.* at 659 ("We can hypothesize no more telling evidence of what he would have done . . . ."). In *Haven,* this court affirmed the District Court's grant of a directed verdict for the defendant, "primarily" for the reasons stated in the District Court's opinion, 494 F.2d at 1070. The trial court's holding rested in part on its finding that "there was no evidence that the parents would not have given their consent" had they known of the risks involved. *Haven v. Randolph,* 342 F.Supp. 538, 544 (D.D.C.1972), *aff'd,* 494 F.2d 1069 (D.C.Cir.1974).

Since the trial court's ruling in this case, however, the District of Columbia Court of Appeals has unequivocally adopted, albeit in dictum, the objective, prudent-person standard. Citing the *Canterbury* case, the court in *Crain v. Allison,* 443 A.2d 558, 563 n. 14 (D.C.App.1982), wrote, "[T]he test of causation is objective. The test is what would a prudent person in the patient's position have decided if informed of all relevant factors . . . ."[6]

---

6. Despite the clarity of this statement, we confess to some doubt as to whether the District of

Columbia courts will apply this rule in every case. After this court adopted the objective

■ Under this standard, it is no longer possible to argue that a patient's testimony is necessary for the issue of causation to get to the jury. The entire motivation for jettisoning the subjective standard of causation was distrust of precisely this testimony. As the *Canterbury* court pointed out, under the objective standard "[t]he plaintiff's testimony is relevant . . . but it would not threaten to dominate the findings." 464 F.2d at 791; *accord Crain*, 443 A.2d at 563 n. 14 ("Although the patient's testimony is relevant on the issue of causation, the test of causation is objective."); *Sard v. Hardy*, 281 Md. 432, 450, 379 A.2d 1014, 1025 (1977) ("Under this rule, the patient's hindsight testimony as to what he would have hypothetically done, though relevant, is not determinative of the issue."). While it might be helpful, the jury certainly does not need the patient's testimony to decide what a reasona-

ble person ·in that position would have done.[7]

III

The District of Columbia courts have not offered the same kind of guidance as to the other major issue raised by this appeal: whether Hartke may recover some portion of the costs of raising to majority the child born after the failed sterilization. Moreover, as the District Court noted, the case law from other jurisdictions is almost evenly divided, some courts allowing some recovery under various formulas, others allowing no recovery whatsoever. *See Hartke v. McKelway*, 526 F.Supp. at 104 & nn. 2 & 3 (citing cases).

In large part, the differences appear to revolve around whether the child can be considered a kind of damage to the par-

standard in *Canterbury,* it and the District Court were evidently confronted with cases in which the question of actual causation could be decided without reference to plaintiffs' speculation about what they would have done had they known of the risks. In *Henderson,* for example, the patient's own pretrial actions made it clear that he would have consented to the removal of his wisdom teeth regardless of whether he was informed of the risk of paresthesia. In the present case, the District Court found that the jury could have found that Hartke would have avoided the risks presented had she known of them even though she did not testify about what she would have done. In such cases, the rationale for the prudent-person standard—distrust of resting the issue of causation on the credibility of the patient's hindsight testimony—falls away, and courts feel pressure to return to the more accurate causation-in-fact standard. On the other hand, the rule one might glean from this line of cases is not entirely logical: the standard of causation by which injuries are judged ends up depending on the fortuity of whether patients happen to have created an evidentiary trail before trial demonstrating what they would have done had they known of the risks. What may eventually emerge is a standard of causation that requires the plaintiff to prove both that he or she would in fact have avoided the risk if informed of it *and* that a reasonable person would have done so.

In any case, if the District of Columbia courts would have applied a subjective standard of causation in this case, the District Court would still have been correct that *in haec verba* testimony is not required to get the question of

causation to the jury. The statement in *Henderson* that seems to impose such a requirement is based on an overreading of *Haven.* *Haven* said only that there was "no evidence" that the parents would have consented, not that there was "no testimony from the parents" to that effect. Moreover, such a requirement would elevate such testimony virtually to the dominant position from which *Canterbury* and *Crain* sought to remove it. Such testimony is of little trustworthiness, so it rationally adds little to the plaintiff's case. To hinge the issue on this testimony is therefore illogical. We agree with the District Court that this is undoubtedly a case in which there was sufficient evidence of what Hartke would have done, even without testimony from her directly addressing the question. *See generally supra* part II (A); *Hartke v. McKelway,* 526 F.Supp. at 103.

7. It should be noted that in any case there is some testimony in this case that could be construed as *in haec verba* testimony that Hartke would have taken steps to avoid the risk had she known of it. Hartke testified as follows:

Q. If someone offered you a million dollars for this baby, would you take it?

A. Sir, *if I had known that the operation was not 100 percent, you could not give me a million dollars for that,* and for a million dollars—I would not take a million dollars for my baby, but I wouldn't go through the hell for a million dollars either.

Transcript of July 23, 1981, at 117 (emphasis added).

ents.[8] A number of courts have ruled that as a matter of law no healthy child can ever be considered an injury to its parents, because, as one court put it, "it is a matter of universally-shared emotion and sentiment that the intangible but all-important, incalculable but invaluable 'benefits' of parenthood far outweigh any of the mere monetary burdens involved." *Public Health Trust v. Brown,* 388 So.2d 1084, 1085–86 (Fla.Dist.Ct.App.1980) (footnote deleted), *review denied,* 399 So.2d 1140 (Fla.1981); *accord, e.g., Cockrum v. Baumgartner,* 51 U.S.L.W. 2534, 2534 (Ill. Feb. 18, 1983) ("In a proper hierarchy of values, the benefit of life should not be outweighed by the expense of supporting it."). Other courts have found that there are some cases in which the addition of a child constitutes an injury to the family. One court provided the following explanation:

> To say that for reasons of public policy contraceptive failure can result in no damage as a matter of law ignores the fact that tens of millions of persons use contraceptives daily to avoid the very result which the defendant would have us say is always a benefit, never a detriment. Those tens of millions of persons, by their conduct, express the sense of the community.

*Troppi v. Scarf,* 31 Mich.App. 240, 253, 187 N.W.2d 511, 517, *leave to appeal denied,* 385

Mich. 753 (1971); *see also Terrell v. Garcia,* 496 S.W.2d 124, 131 (Tex.Civ.App.1973) (Cadena, J., dissenting) ("The birth of [an " 'unwanted' "] child may be a catastrophe not only for the parents and the child itself, but also for previously born siblings."), *cert. denied,* 415 U.S. 927, 94 S.Ct. 1434, 39 L.Ed.2d 484 (1974).

Though we need not finally decide the question given our ultimate result, we suspect that allowing the plaintiff to prove that raising a child constitutes damage is the course of greater justice, and the one the District of Columbia courts may well adopt. Usually, of course, it is true that the birth of a healthy child confers so substantial a benefit on its parents as to outweigh the physical, emotional, and financial burdens of bearing and raising it; "else, presumably, people would not choose to multiply so freely," *Troppi,* 31 Mich.App. at 254, 287 N.W.2d at 517. But when a couple has chosen not to have children, or not to have any more children, the suggestion arises that for them, at least, the birth of a child would not be a net benefit. That is their choice and the courts are required to respect it. *Cf. Roe v. Wade,* 410 U.S. 113, 153, 93 S.Ct. 705, 726–727, 35 L.Ed.2d 147 (1973) (woman's right to abortion: "Maternity, or additional offspring, may force upon the woman a distressful life and future."); *Griswold v. Connecticut,* 381 U.S.

---

**8.** Cases that do not fit into the categorization outlined in text include those that recognize that the parents may suffer damage from the birth of a child, but find that those damages are too speculative for calculation. *See, e.g., Coleman v. Garrison,* 349 A.2d 8, 12 (Del.1975); *Sorkin v. Lee,* 78 A.D.2d 180, 181, 434 N.Y.S.2d 300, 301 (1980). While the calculation of damages in a case like this may be difficult, we see no significant distinction between the task here and the analogous task of fixing damages for wrongful death, *see, e.g., Hord v. National Homeopathic Hosp.,* 102 F.Supp. 792 (D.D.C.1952) (death of three-day-old infant), *aff'd,* 204 F.2d 397 (D.C.Cir.1953), for pain and suffering, or for extended loss of consortium, *see, e.g., Hitaffer v. Argonne Co.,* 183 F.2d 811, 815 (D.C.Cir.) (loss of consortium due to permanent injuries), *cert. denied,* 340 U.S. 852, 71 S.Ct. 80, 95 L.Ed. 624 (1950). *Accord Ochs v. Borrelli,* 187 Conn. 253, 260, 445 A.2d 883, 886 (1982); *Troppi v. Scarf,* 31 Mich.App. 240, 261–62, 187 N.W.2d 511, 521, *leave to appeal denied,* 385 Mich. 753

(1971); *Mason v. Western Pa. Hosp.,* 286 Pa. Super. 354, 366–67, 428 A.2d 1366, 1372 (1981) (en banc) (Brosky, J., concurring), *aff'd,* 499 Pa. 484, 453 A.2d 974 (1982). Another argument that does not relate to whether the birth of a child can be damage to the parents is that the children involved might be adversely affected when they found out that their birth was attributable to a doctor's negligence rather than to their parents' desires, or that their parents once claimed they were not worth the cost of raising them. *See, e.g., Coleman,* 349 A.2d at 14 (showing concern that child might view case as "founded on rejection of him as a person"); Note, 13 Val.U.L.Rev. 127, 142 (1978). We are not convinced that the effect on the child will be significantly detrimental in every case, or even in most cases; at least in the absence of that, we think the parents, not the courts, are the ones who must weigh the risk. *Accord Sherlock v. Stillwater Clinic,* 260 N.W.2d 169, 176–77 (Minn.1977).

479, 485–86, 85 S.Ct. 1678, 1682, 1683, 14 L.Ed.2d 510 (1965) (couple's right to use contraceptives).

Nevertheless, courts have recognized that there is an unusual difficulty in wrongful conception cases in setting the amount of compensation, because the extent, if any, to which the birth of a child is an injury to particular parents is not obvious but will vary depending on their circumstances and aspirations. *See Troppi,* 31 Mich.App. at 256–57, 187 N.W.2d at 518–19 (consequences of birth from failure of contraceptives will vary widely with purposes and circumstances of parents, comparing unmarried college student with honeymooning newlyweds). The parents may in fact have ended up with a child that they adore and that they privately consider to be, on balance, an overwhelming benefit to their lives.[9] This is because the parents may have sought to avoid conception for any of a number of reasons. They may have done so for socioeconomic reasons, seeking to avoid disruption of their careers or lifestyle, or to conserve family resources, *see, e.g., Troppi,* 31 Mich.App. at 244, 187 N.W.2d at 512 (after seven children, parents decided to limit size of family); *Sherlock v. Stillwater Clinic,* 260 N.W.2d 169, 171 (Minn.1977) (same); *Betancourt v. Gaylor,* 136 N.J.Super. 69, 74, 344 A.2d 336, 339 (1975) (parents sought to avoid expense of additional child); for eugenic reasons, seeking to avoid the birth of

**9.** It has been said that courts should not allow defendants in wrongful conception cases to thrust upon the plaintiff an unwanted benefit, and that therefore a plaintiff's recovery should not be reduced by any benefits conferred by the defendant's tort. For example, one commentator has written:

> Certainly, the birth of the child may confer certain intangible emotional benefits upon the parent, but these are benefits the parent did not ask for and quite possibly cannot afford. The defendant can be analogized to an officious intermeddler, and when he argues that the damages assessed against him should be offset by the unsolicited benefits of parenthood, the resemblance is quite striking indeed.

Kashi, The Case of the Unwanted Blessing: Wrongful Life, 31 U. Miami L.Rev. 1409, 1416 (1977).

Nevertheless, the courts that allow any recovery of childrearing damages have, with apparently only two exceptions, always required that the detriments of childrearing be offset against the benefits. *See, e.g., Ochs v. Borrelli,* 187 Conn. 253, 256 n. 3, 445 A.2d 883, 884 n. 3 (1982); *Troppi,* 32 Mich.App. at 254–57, 187 N.W.2d at 517–19; *Sherlock v. Stillwater Clinic,* 260 N.W.2d 169, 176 (Minn.1977); *Betancourt v. Gaylor,* 136 N.J.Super. 69, 344 A.2d 336 (1975). *But see Custodio v. Bauer,* 251 Cal. App.2d 303, 324, 59 Cal.Rptr. 463, 477 (1967) (compensation is "to replenish the family exchequer so that the new arrival will not deprive the other members of the family of what was planned as their just share of the family income"); *Bowman v. Davis,* 48 Ohio St.2d 41, 356 N.E.2d 496 (1976).

It may be, as one court has said, that allowing the benefits of childrearing to reduce the damages recoverable "is nothing more nor less than the application of an offset to reduce the magnitude of verdicts and lessen the monetary shock to the medical tortfeasor and his insurer." *Kingsbury v. Smith,* 122 N.H. 237, 243, 442 A.2d 1003, 1006 (1982); *cf. Palsgraf v. Long Island R.R.,* 248 N.Y. 339, 352, 162 N.E. 99, 103 (1928) (Andrews, J., dissenting) (similar suggestion as to proximate cause) (quoted *infra* note 16). If this is so, it is nonetheless true that this desire to reduce the verdict is widely shared, and reflects deeply felt values. The desire may perhaps be based on a sense that, "even in this day of sophisticated contraception and family planning," couples are commonly faced with unanticipated pregnancies, *Sorkin v. Lee,* 78 A.D.2d 180, 184, 434 N.Y.S.2d 300, 302–03 (1980). Thus, the sense of wrong that may arise in cases where the defendant usurps the plaintiffs' right to use their property as they please, *see, e.g., Read v. Webster,* 95 Vt. 239, 113 A. 814 (1921) (flooded land), is tempered by the knowledge that the ability to be free of unwanted pregnancy has never been all that secure. The benefits that the parents of an unplanned child derive from parenthood are nonetheless real. The feeling in wrongful conception cases may be that, especially in view of the parents' concerted efforts to avoid pregnancy, they should recover something in addition to medical expenses and pain and suffering for the disruption of their planning and of their lifestyles. But to refuse to recognize the benefits of childrearing would be contrary to all the humanistic impulses that the law should seek to reinforce, *see Cockrum v. Baumgartner,* 51 U.S.L.W. 2534, 2534 (Ill. Feb. 18, 1983), and would give plaintiffs a windfall with which to deal with a problem that many couples face without compensation. Whatever the reason, the virtual unanimity of opinion on this question convinces us that the District of Columbia courts would share the sense of justice evinced by the cases, and would adopt some form of the benefits rule.

a handicapped child, see, e.g., Ochs v. Borrelli, 187 Conn. 253, 254–55, 445 A.2d 883, 883–84 (1982) (semble) (prior two children born with orthopedic defects); or for therapeutic reasons, seeking to avoid the dangers to the mother's health of pregnancy and childbirth, see e.g., Wilczynski v. Goodman, 73 Ill.App.3d 51, 53, 29 Ill.Dec. 216, 218, 391 N.E.2d 479, 481 (1979) (therapeutic abortion); Christensen v. Thornby, 192 Minn. 123, 123, 255 N.W. 620, 621 (1934) (vasectomy sought because wife had been told another birth would be dangerous to her health).[10]

When a couple chooses sterilization solely for therapeutic or eugenic reasons, it seems especially likely that the birth of a healthy child, although unplanned, may be, as it is for most parents, a great benefit to them. In such cases, a court will tend to feel that it is unjust to impose on the defendant doctor the often huge costs of raising the child, and will fear that a jury that did so was motivated by passion or anti-doctor prejudice. Thus, in considering the question of whether childrearing expenses may be recoverable, many courts and commentators have placed great emphasis on the couple's reasons for undergoing sterilization. For example, the court in the earliest wrongful conception case, Christensen v. Thornby, made the point most clearly:

> The purpose of the operation was to save the wife from the hazards to her life which were incident to childbirth. It was not the alleged purpose to save the expense incident to pregnancy and delivery. The wife has survived. Instead of losing his wife, the plaintiff has been blessed with the fatherhood of another child. The expenses alleged are incident to the bearing of a child, and their avoidance is remote from the avowed purpose of the operation.

Id. at 126, 255 N.W. at 622 (alternative holding). Other cases are to the same effect. See, e.g., Betancourt, 136 N.J.Super. at 72–75, 344 A.2d at 338–39 (distinguishing

denial of recovery in Gleitman v. Cosgrove, 49 N.J. 22, 227 A.2d 689 (1967), on basis of eugenic rather than economic purpose there); Speck v. Finegold, 268 Pa.Super. 342, 358–59, 362, 408 A.2d 496, 505, 507 (1979) (discussing Christensen, Betancourt, and Gleitman), aff'd, 497 Pa. 77, 439 A.2d 110 (1981); id. at 374 n. 6, 408 A.2d at 513 n. 6 (Spaeth, J., concurring & dissenting) (where birth was unwanted because of risk that in the end did not materialize—such as danger to mother or fear of deformity—"arguably the damages should not include the expenses of raising the child"); Terrell, 496 S.W.2d at 130 (Cadena, J., dissenting) (distinguishing Hays v. Hall, 477 S.W.2d 402 (Tex.Civ.App.), rev'd, 488 S.W.2d 412 (Tex.1972), because of eugenic purpose there); Bishop v. Byrne, 265 F.Supp. 460, 463 (S.D.W.Va.1967) (under West Virginia law, victim was injured by failure of therapeutic sterilization "if the condition which [the operation] sought to avoid subsequently occurred"); see also Comment, Liability for Failure of Birth Control Methods, 76 Colum.L.Rev. 1187, 1197 (1976) [hereinafter cited as Columbia Note] ("If contraceptive measures fail here [where they have been used for therapeutic or eugenic purposes], but a normal child is born, damages might properly be denied on the theory that no injury was suffered."); Recent Case, 28 DePaul L.Rev. 249, 257 (1978) (proposing use of special negligence instruction that would consider the purpose of the sterilization and family circumstances in determining the actual damage caused); Note, Wrongful Conception: Who Pays for Bringing up Baby?, 47 Fordham L.Rev. 418, 432 (1978) [hereinafter cited as Fordham Note] ("In wrongful conception cases, the 'value' of parenthood will vary according to the individual's reasons for wanting the sterilization operation."); Note, Wrongful Birth: A Child of Tort Comes of Age, 50 U.Cin.L.Rev. 65, 78 (1981) ("[I]f plaintiffs in a failed sterilization case hope to gain maximum recovery, they will have to prove that the purpose of steriliza-

---

10. The terminology used here comes from Speck v. Finegold, 268 Pa.Super. 342, 348 n. 4, 408 A.2d 496, 499 n. 4 (1979), aff'd, 497 Pa. 77,

439 A.2d 110 (1981). Our enumeration of these three reasons for seeking sterilization is not intended to exhaust the possibilities.

tion was to prevent pregnancy and not possible injury to the woman because of pregnancy.").

■ We tend to agree that a factfinder should place great weight on a couple's reason for undergoing sterilization in deciding whether the subsequent birth of a child, on balance, constitutes damage to the parents. Their reason for departing from the usual view that childrearing is a positive experience is in effect a calculation of the way in which they anticipate the costs of childbirth to outweigh the benefits. That calculation, untainted by bitterness and greed, or by a sense of duty to a child the parents have brought into the world, is usually the best available evidence of the extent to which the birth of the child has in fact been an injury to them. Thus, for example, where a couple sought sterilization solely for therapeutic or eugenic reasons, there is a presumption raised that the uneventful birth of a healthy child constitutes damage to the parents only to the extent that they experienced abnormal fear of harm to the mother or of the birth of a handicapped child. Courts and juries may assume that the parents treasure the child and that the usual expenses of raising it will be outweighed by the benefits derived.

The presumption raised by the evidence of the parents' reason for seeking sterilization is, however, rebuttable. If it can be shown that the parents' situation has somehow significantly changed since the sterilization—by reliance on presumed infertility in making an income-reducing career change, for example, or by a sudden increase in wealth—it may be that the original calculation of anticipated injury has changed for better or worse. *See, e.g.,* Columbia Note, *supra,* at 1197 ("the motive for having a vasectomy or tubal ligation is relevant as evidence of lack of injury but should not be dispositive"); Fordham Note, *supra,* at 435 (where motives for sterilization are economic, "sudden relief from financial hardship or a reduction in family size" after operation may make benefits override burdens); Note, *Wrongful Birth Damages: Mandate and Mishandling by Judicial Fiat,* 13 Val.U.L.Rev. 127, 135 & n. 66 (1978) (parent may have taken early retirement).[11] Generally, however, the plaintiff's recovery will most accurately reflect the amount of injury incurred if it is limited to paying for those risks that the plaintiff specifically sought to avoid and that came to pass.[12]

■ In jury trials, of course, it is usually the task of a properly instructed jury to find such facts as the plaintiff's motive in seeking sterilization and other facts reflect

11. We note that some courts appear to treat the reason for undergoing sterilization not as the best evidence of whether the birth of a child constitutes damage to the parents, but as conclusive evidence of that fact. The theory is that plaintiffs should recover only for those harms that they sought to avoid. *E.g., Christensen,* 192 Minn. at 126, 255 N.W. at 622; *see* Columbia Note, *supra,* at 1197 (criticizing this per se approach). We think such an approach conflicts with the standard tort damages rule that a defendant takes his plaintiff as he finds him, and pays for all damages proximately caused. *See, e.g., Lockwood v. McCaskill,* 262 N.C. 663, 138 S.E.2d 541 (1964) (once breach of duty is proved, defendant is liable for all damages suffered by plaintiff notwithstanding plaintiff's peculiar predisposition to amnesia). Regardless of the reason for which the parents sought sterilization, there may be persuasive evidence that the birth of a child was, at the time of birth, damage to them; the parents may have guessed wrong in their initial calculation or they may have changed their minds. In the absence of intervening cause, the defendant must pay for that damage.

Since the approach outlined in the text is merely a guideline to be used in evaluating the evidence in the usual case, and not a conclusive test, it avoids placing undue weight on what the patient told the doctor. For any of a number of reasons, the patient may not have given the doctor all the reasons involved or even the right ones. Also, we would not want to encourage doctors to take extra care with persons who provide "expensive" reasons, or to refuse to treat them altogether.

12. This approach will be primarily useful in cases in which the evidence of the reason for undergoing sterilization is unambiguous and overwhelming, as it is in this case. Where there is a mixture of motivations, and the socio-economic reasons are at least a but-for reason for undergoing the operation, the trier of fact will have to look to more direct, but perhaps less reliable, evidence of whether the birth of a child constitutes damage to the parents.

ing the degree to which childrearing ultimately constitutes injury to the plaintiff. Nevertheless, there are always cases in which a rational jury could find that the evidence suggested only certain facts, and in those cases such findings must be directed by the court, notwithstanding the jury's verdict. On the issue of whether childrearing constituted injury to Hartke, the District Court, as we read its opinion, found this to be such a case. We agree.

■ The evidence here is overwhelming that Sandra Hartke sought to be sterilized for therapeutic reasons: she desperately feared that serious complications or even death would result from pregnancy and childbirth. The record is filled with testimony to this effect. For example, Hartke testified that she told Dr. McKelway "that I didn't want to be pregnant, and I was terrified of being pregnant, and I was extremely concerned about doctors and hospitals. That was my overriding concern." Tran-

script at July 23, 1981, at 85–86. She also said she told him

[t]hat I did not want to go through a pregnancy, that I was terrified of going through a pregnancy, and I felt I was going to die, and I had been advised by doctors that I would not make it through a pregnancy. I told him that I had peritonitis, which was gangrene, of the abdominal cavity in 1964 when I had my first daughter.

\* \* \* \* \* \*

... He said that he could perform an abortion in the hospital, and I said I didn't want to be put in this position anymore. I couldn't keep coping with the idea that I was going to die. I wanted him to help me find a way that I wouldn't have to keep going back into the hospital for all these kinds of problems. He told me that he can sterilize me. Transcript of July 21, 1981, at 8, 14. Other like testimony is printed in the margin.[13]

---

13. The other testimony from Hartke about her reasons for undergoing sterilization or her fear of pregnancy is as follows:

Q. Will you tell the Court and jury what you told Dr. McKelway as to the reason that you were there?
. . . .
THE WITNESS: I told him that I didn't want to be pregnant because I had a very traumatic time in 1964 having my daughter, and I thought I was going to die. Okay.
Q. . . . . No more crying.
A. All right.
Transcript of July 21, 1981, at 7.
Q. . . . . Did anybody else say anything there?
A. Danny [Hartke's boyfriend] asked Dr. McKelway rather than have me go through the surgery, since I was so terrified of the hospital and surgical procedures, it would be easier—it would be easier for him to have a vasectomy.
Id. at 15.
Q. At that time did you—what did you do when you went to the hospital, as you came into the hospital?
A. I was crying, and I get very upset when I have to go to the hospital.
. . . .
... I have a very difficult time controlling myself in hospitals.
Id. at 20.
Q. Did you have any fear at that time [when making the decision not to have an abortion]?

A. Yes.
Q. What was your fear?
A. I am terribly afraid that I am going to die when I am pregnant. Every time—
Id. at 32.
"Question: What conversation did you have with him at that time?
"Answer: I didn't want to have a pregnancy, I didn't want to be ever in the position of just being pregnant again and having operations."
Transcript of July 23, 1981, at 89 (reading from deposition).
A. . . . . I did not ever want to be pregnant again. That's why I went [to see Dr. McKelway].
Id. at 90.
"Answer: Well, then I said, 'I don't want this to happen again. I am very, very upset and very nervous about going in the hospital, and I don't want to go back and would do anything. What am I to do to keep from coming back and having a pregnancy every time I turn around?'
. . . .
"Answer: I said that I didn't want to have any more children. What method was available besides the IUD? And he said, 'You could be sterilized.'"
Id. at 104–05 (reading from deposition).
A. Sir, I love my daughter.
. . . .
Q. (By Mr. Attridge) She gives you no comfort and joy whatsoever?
A. She gives me joy, but I don't know how she gives me comfort. No, she doesn't

The testimony of Dr. McKelway and of Hartke's husband was to the same effect.[14]

That the danger of childbirth remained her sole concern up to the time of her pregnancy is clear from her reasons for deciding not to have an abortion. Once the pregnancy was determined, by means of a sonogram, not to be ectopic, Hartke was advised that the risks of carrying the pregnancy to term were about the same as the risks of abortion. She testified that she decided not to have an abortion because, "[h]aving decided that the risks were equal either way, that to resterilize me Dr. Barter was going to open me back up, then I might as well try to carry the pregnancy to term,

> help me in the middle of the night when I am having nightmares about being pregnant, if that's what you're asking. No, that's no comfort.
> Id. at 114.

**14.** See Transcript of July 24, 1981, at 304 (testimony of Weddle) (describing Hartke's fear of pregnancy); id. at 311–12 (testimony of McKelway) (same); id. at 348 (McKelway) (reading from report about her "'very apprehensive'" state upon admission to hospital); Transcript of July 24, 1981, afternoon session, at 4 (McKelway) (same).

The only evidence suggesting that plaintiff had other than therapeutic motives is circumstantial: Hartke was 33 years old and had a 13-year-old daughter when she first sought to be sterilized. On the other hand, she had divorced her first husband and was then living in an apparently stable relationship with the man she would eventually marry.

**15.** In view of the result we reach, we do not need to decide the related question of whether Hartke's failure to have an abortion or place the child for adoption would preclude her from recovering childrearing expenses. Compare Troppi v. Scarf, 31 Mich.App. 240, 260, 187 N.W.2d 511, 520 ("While the reasonableness of a plaintiff's efforts to mitigate is ordinarily to be decided by the trier of fact, we are persuaded to rule, as a matter of law, that no mother, wed or unwed, can reasonably be required to abort ... or place her child for adoption.") (footnote omitted), leave to appeal denied, 385 Mich. 753 (1971), and Sherlock v. Stillwater Clinic, 260 N.W.2d 169, 176 (Minn. 1977) (same), with Sorkin v. Lee, 78 A.D.2d 180, 181, 434 N.Y.S.2d 300, 301 (1980) (plaintiffs' failure to have abortion barred recovery of childrearing expenses), Ziemba v. Sternberg, 45 A.D.2d 230, 234, 357 N.Y.S.2d 265, 270 (1974) (Cardamone, J., dissenting) (in failed abortion case, plaintiff's failure to have another abortion after pregnancy was discovered in

that Dr. Barter would help me through the pregnancy." Transcript of July 21, 1981, at 32. This is the only testimony regarding her reasons for carrying the pregnancy to term. It seems clear, then, that once the extraordinary dangers of childbirth for her were passed, Hartke shared the general view that having a child would, on balance, be a positive experience.[15]

In these circumstances, we agree that the jury could not rationally have found that the birth of this child was an injury to this plaintiff. Awarding childrearing expenses would only give Hartke a windfall.[16]

fourth month "should operate to bar her present claim for damages"), Columbia Note, supra, at 1203 n. 91 (reasonableness of failure to abort could be left to jury), and Note, Judicial Limitations on Damages Recoverable for the Wrongful Birth of a Healthy Infant, 68 Va.L.Rev. 1311, 1328 (1982) (question of reasonableness of failure to have abortion or place child for adoption is one of fact, not of law). Conceivably, a holding based on Hartke's failure to mitigate damages by having an abortion might reduce the damages for medical expenses and pain and suffering that McKelway must pay under our present approach, see infra note 16. McKelway has not pressed this claim here, however, and has in any case provided no evidence as to what Hartke's medical expenses and suffering would have been had she aborted the fetus, see G & R Corp. v. American Security & Trust Co., 523 F.2d 1164, 1176 (D.C.Cir.1975) (defendant bears burden of proving mitigation).

**16.** Conceivably, the benefits of childraising could be so weighty as to outweigh even the pain and anguish associated with the pregnancy and childbirth. Certainly, this is true in the usual case, since parents are apparently not deterred from having children by the usual prenatal pain and discomfort. Courts that have applied the rule of offsetting benefits against detriments in wrongful conception cases have done so in a variety of ways, however. See generally Note, Wrongful Birth: A Child of Tort Comes of Age, 50 U.Cin.L.Rev. 65, 79–80 (1981) (reviewing various applications of the benefits rule). Some have allowed the benefits of childrearing to be offset against all damages, so that it might happen that a plaintiff would not even recover for medical expenses or pain and suffering. See Troppi v. Scarf, 31 Mich. App. 240, 255, 187 N.W.2d 511, 518, leave to appeal denied, 385 Mich. 753 (1971). Others limit the offset to reducing childrearing expenses, so that medical expenses and the pain

## IV

The judgment of the District Court is affirmed.

and suffering of pregnancy would be separately recoverable. *See Sherlock v. Stillwater Clinic,* 260 N.W.2d 169, 175–76 (Minn.1977); *cf. Thompson v. Town of Ft. Branch,* 204 Ind. 152, 164–65, 178 N.E. 440, 444–45 (1931) (in wrongful death case, cost of maintenance of son should be offset only against value of his services, not against funeral expenses). The *Restatement (Second) of Torts* offers the narrowest offset rule, requiring that the benefits conferred by a tortfeasor be considered in mitigation of damages only when the benefits are to the same "interest" of the plaintiff that was harmed. Restatement (Second) of Torts § 920 (1979). As applied in the comments, this would require that the pecuniary expenses of childraising be offset only by the monetary benefits that the child brings in, and not by the psychological or emotional rewards derived. *Id.* comment b (damages to husband for loss of consortium are not diminished by savings derived from no longer having to support wife); *see Custodio v. Bauer,* 251 Cal.App.2d 303, 323, 59 Cal.Rptr. 463, 476 (1967) (if pregnancy benefited wife's health or emotional makeup, defendant should be able to offset that against *pain and damage to* health); *Recent Case,* 28 DePaul L.Rev. 249, 254–57 (1978) (criticizing courts for misapplying *Restatement* rule); Note, 13 Val.U.L.Rev. 127, 159 (1978) (same); Note, 68 Va.L.Rev. 1311, 1326 (1982) (same). The overwhelming majority of courts that have invoked the benefits rule in wrongful conception cases have rejected the strict terms of the *Restatement* approach.

Few of these sources provide a clear rationale for the lines they draw. Perhaps the most logical approach, in light of the presumptions discussed in this opinion, would be to allow the benefits of childrearing to be offset against the normal pain and expenses of pregnancy and childbirth, but not against any extraordinary expenses and pain associated with the conditions that moved the parents to seek sterilization. *See supra* p. 1555. This suggestion may, however, attempt to put too fine a point on an admittedly uncertain calculation. Once again, *see supra* note 9, it may be that the courts' motivations are most accurately stated in terms of rough justice or public policy, like the explanation once given of the concept that damages are limited to those proximately caused by a tort:

> What we . . . mean by the word "proximate" is that, because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point. This is not logic. It is practical politics.

*It is so ordered.*

*Palsgraf v. Long Island R.R.,* 248 N.Y. 339, 352, 162 N.E. 99, 103 (1928) (Andrews, J., dissenting) (quoted in *Mason v. Western Pa. Hosp.,* 286 Pa.Super. 354, 366, 428 A.2d 1366, 1372 (1981) (en banc) (Brosky, J., concurring), *aff'd,* —— Pa. ——, 453 A.2d 974 (1982)).

The District Court in this case allowed the benefits of childrearing to be offset against the expenses thereof, but not against the expenses and pain associated with the pregnancy itself. 526 F.Supp. at 106 (special verdict form). We think this was a fair place to draw the line. The latter expenses and pain are more clearly separable from the benefits of raising a child than are the expenses of raising it. *See generally Troppi,* 31 Mich.App. at 255, 187 N.W.2d at 518 (positing the severability criterion, but concluding that "pregnancy and its attendant anxiety, incapacity, pain, and suffering are inextricably related to child bearing"); *cf. generally Wilczynski v. Goodman,* 73 Ill.App.3d 51, 63, 29 Ill.Dec. 216, 225, 391 N.E.2d 479, 488 (1979) (recovery of childrearing expenses disallowed on public policy grounds but medical expenses deemed compensable because they have little to do with a child's right to life); *Thompson,* 204 Ind. at 164, 178 N.E. at 444 (in wrongful death action, funeral expenses and medical expenses are a "distinct item[ ] of damage[ ]," separate from the value of lost services). More important, if the benefits of childrearing were offset against all damages, it might happen that the defendant would pay no damages whatsoever, which would not provide any disincentive to negligence. *See Wilczynski,* 73 Ill.App.3d at 63, 29 Ill.Dec. at 225, 391 N.E.2d at 488; *Mason,* 286 Pa.Super. at 381, 428 A.2d at 1380 (Hester, J., concurring & dissenting) (" 'immunity tends to foster negligence while liability tends to induce care and caution' ") (quoting *Flagiello v. Pennsylvania Hosp.,* 417 Pa. 486, 505, 208 A.2d 193, 202 (1965) (original reads "neglect" not "negligence")). Therefore, we agree that Hartke may recover damages for her medical expenses and pain and suffering during pregnancy and childbirth without regard to the benefits of childraising.

Generally for the reasons stated in the District Court's opinion, 526 F.Supp. at 103, we will not disturb its ruling as to the remaining issue raised by McKelway: that he was entitled to a new trial because of the court's failure to reopen discovery in order to allow him to depose one of Hartke's witnesses. Hartke notified McKelway of the experts she expected to have testify almost two weeks before the close of discovery. McKelway did not notify Hartke of his experts' names until three months later. Under these circumstances, there was no abuse of discretion in allowing Hartke to depose McKelway's experts after the close of dis-

covery, while refusing to allow McKelway to

depose Hartke's at that time.