473 A.2d 429

**Thomas W. JONES**

v.

**Juanita MALINOWSKI et vir.**

**No. 29 Sept. Term, 1983.**

Court of Appeals of Maryland.

April 6, 1984.

Patricia M. Flannery and John F. King, Baltimore (Angus R. Everton and Anderson, Coe & King, Baltimore, on the brief), for appellant.

Gary I. Strausberg, Baltimore (M. Melinda Thompson and Melnicove, Kaufman, Weiner & Smouse, P.A., Baltimore, on the brief), for appellees.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

MURPHY, Chief Judge.

We granted certiorari to consider a single issue of first impression in this State raised in the joint petition of the parties, namely: "Where a negligently performed sterilization resulted in the birth of a healthy child, did the trial court err in its charge that the jury could award damages for the expenses of raising the unplanned child during minority reduced by the value of the benefits conferred upon the parents by having the child?"[1]

---

1.   Our grant of certiorari was prior to consideration of the appeal by the Court of Special Appeals. See Maryland Code (1980 Repl.Vol.), § 12–201 of the Courts and Judicial Proceedings Article.

I.

The record discloses that Leon and Juanita Malinowski were married in 1971 and had three children, born in 1973, 1975 and 1978. Mrs. Malinowski's first pregnancy resulted in a breech birth; the second child was born with a brain disease and the third child nearly died at birth and suffers from heart disease. The Malinowskis are of limited financial means. He is employed as a drafting technician. Mrs. Malinowski, prior to the birth of her first child, was employed as a cryptology assistant by the federal government. She worked only sporadically after the birth of her first child, but planned to work full time after her third child reached school age. Her potential earnings would have increased the Malinowskis' annual income by approximately sixty percent.

After the birth of their third child, the Malinowskis decided not to have any more children. Economic factors motivated their decision; they determined that they could not afford to support another child. In addition, Mrs. Malinowski wished to avoid the possible recurrence of her prior traumatic experiences with pregnancy and child birth. Consequently, she sought to be sterilized by Dr. Thomas W. Jones. The Malinowskis advised Dr. Jones of their reasons for wanting to prevent future pregnancies.

On June 2, 1978, Dr. Jones performed a sterilization operation upon Mrs. Malinowski, who was then twenty-five years old. The operation, known medically as a bipolar tubal laparoscopy, consisted of blocking both Fallopian tubes by cauterization. Dr. Jones misidentified the left tube and cauterized the wrong structure, leaving the left tube intact. As a result, the sterilization operation proved ineffective. Subsequently, Mrs. Malinowski again became pregnant and on August 16, 1979, gave birth to the couple's fourth child, Juanita. The child was born normal, is healthy and is loved by her parents. Juanita's birth, however, placed a greater financial burden on the Malinowskis in the rearing of another child, *i.e.,* added expenses associated with the costs of

housing, food, transportation, clothing, medical care and education.

The Malinowskis sued Dr. Jones in the Circuit Court for Baltimore County in tort for negligent sterilization. At the trial, Dr. Thomas Espenshade, an economist demographer appearing on behalf of the Malinowskis, testified that based on Mr. Malinowski's earning history, the family's standard of living, and other factors, it would cost the couple an estimated $53,702 in 1981 dollars to raise Juanita from birth to majority. The witness estimated that it would cost $85,053 to rear Juanita if Mrs. Malinowski were employed.

In instructing the jury on damages, the court (Sfekas, J.) said that "persons have the right to limit the size of their family for whatever reason, be it for health or socio-economic reasons, and limiting the size of the family may be done by various means which include sterilization." The court charged the jury that it could consider, as an element of damages for negligent sterilization, "the costs of raising the unplanned child from birth to the age of majority, which is eighteen." [2] It also instructed the jury to consider in mitigation of damages "the value conferred upon [the Malinowskis] in having a healthy child, such as the child's aid, comfort and society during the parents' life expectancy." The jury was further instructed that in computing damages, if any, it was not to consider that the Malinowskis "might have aborted the child or placed the child out for adoption [since] . . . as a matter of personal conscience and choice parents may wish to keep an unplanned child."

---

**2.** Judge Sfekas instructed the jury that in addition to rearing costs, it could consider other elements of damages, i.e., (1) "the personal injuries including mental distress sustained, and their extent and duration"; (2) "the effects that such injuries have on the overall physical and mental health and well-being of the plaintiffs as well as the effect on the marriage relationship"; (3) "the pain and suffering accompanying childbirth"; (4) "the medical and other expenses reasonably incurred"; and (5) "the loss of earnings, if any, you find in the past, and such earnings or reduction in earning capacity which with reasonable probability may be expected in the future."

After finding that Dr. Jones was negligent, the jury awarded $70,000 in damages to the Malinowskis. It cannot be ascertained from the jury's general lump sum damage award whether it included any money for rearing costs, or, if it did, the extent to which, if any, it took into account the benefits conferred upon the Malinowskis by having a healthy and normal child.

## II.

Before us Dr. Jones argues that the trial court erred in instructing the jury that it could consider rearing costs as an element of damages. He contends that the creation of a healthy normal child does not constitute a legally cognizable injury giving rise to damages for child rearing costs under the law of Maryland. This is so, Dr. Jones maintains, because the benefits of having a normal child outweigh the costs of rearing the child to majority, both as a matter of law and of the public policy of the State, as expressed in the Wrongful Death Act, Maryland Code (1980 Repl.Vol.), § 3–901—904 of the Courts and Judicial Proceedings Article. This statute, according to Dr. Jones, is premised on the notion that the deprivation of life due to another's negligence is a compensable wrong; that in light of this established policy, the creation of life cannot constitute a compensable wrong; and that, consequently, the Wrongful Death Act precludes the recognition of child rearing costs as damages, absent a legislative act authorizing their recovery. Dr. Jones further argues that rearing costs are too speculative and unascertainable in any event to constitute the basis of an award for damages. He claims that the overwhelming majority of courts which have considered whether rearing costs are recoverable in a negligent sterilization case support his position. He urges that damages must be limited to the costs of the second sterilization procedure, which Mrs. Malinowski subsequently underwent, together with pain and suffering associated with that operation.

## III.

That there is a cause of action in tort based upon traditional medical malpractice principles for negligence in the performance of a sterilization procedure is well accepted. *See* Annot., *Tort Liability For Wrongfully Causing One To Be Born,* 83 A.L.R.3d 15 (1978). Maryland law is in accord. *See Sard v. Hardy,* 281 Md. 432, 379 A.2d 1014 (1977). The cases are divided, however, as to whether the cause of action encompasses damages for the costs of rearing the unplanned but healthy child to majority. Most jurisdictions deny recovery for these costs. *See Boone v. Mullendore,* 416 So.2d 718 (Ala.1982); *Wilbur v. Kerr,* 275 Ark. 239, 628 S.W.2d 568 (1982); *Coleman v. Garrison,* 327 A.2d 757 (Del.Super.Ct. 1974), *aff'd* 349 A.2d 8 (Del.1975); *Fassoulas v. Ramey,* —— So.2d —— (Fla.), decided February 18, 1984; *Public Health Trust v. Brown,* 388 So.2d 1084 (Fla.Dist.Ct.App.1980); *Cockrum v. Baumgartner,* 95 Ill.2d 193, 69 Ill.Dec. 168, 447 N.E.2d 385, *cert. denied,* —— U.S. ——, 104 S.Ct. 149, 78 L.Ed.2d 139 (1983); *Schork v. Huber,* 648 S.W.2d 861 (Ky. 1983); *Kingsbury v. Smith,* 122 N.H. 237, 442 A.2d 1003 (1982); *P. v. Portadin,* 179 N.J.Super. 465, 432 A.2d 556 (1981); *Sala v. Tomlinson,* 73 A.D.2d 724, 422 N.Y.S.2d 506 (1979); *Sorkin v. Lee,* 78 A.D.2d 180, 434 N.Y.S.2d 300 (1980); *Mason v. Western Pennsylvania Hospital,* 499 Pa. 484, 453 A.2d 974 (1982); *Hickman v. Myers,* 632 S.W.2d 869 (Tex.App.1982); *Terrell v. Garcia,* 496 S.W.2d 124 (Tex.Civ. App.1973); *Beardsley v. Wierdsma,* 650 P.2d 288 (Wyo.1982); *McNeal v. United States,* 689 F.2d 1200 (4th Cir.1982) (dicta applying Virginia law); *White v. United States,* 510 F.Supp. 146 (D.Kan.1981) (applying Georgia law).

These cases, recognizing the paramount importance of the family to society, and the need to develop and preserve the family relationship, conclude in one form or another that public policy considerations dictate that the birth of a healthy child is always a benefit to the parents which, as a matter of law, outweighs concomitant financial child rearing burdens imposed upon the parents by the unplanned child's birth. This view was recently expressed by the Supreme

Court of Illinois in *Cockrum v. Baumgartner,* 95 Ill.2d 193, 69 Ill.Dec. 168, 447 N.E.2d 385 (1983). In declining to apply the traditional tort concept that a tortfeasor is liable for all costs resulting from the tortious misconduct, the court there observed, as to rearing costs in negligent sterilization cases, that "[r]easonableness is an indispensable quality in the administration of justice." 69 Ill.Dec. at 173, 447 N.E.2d at 390. It said that to consider the birth of a healthy child as an injury to the parents "offends fundamental values attached to human life." *Id.* at 171, 447 N.E.2d at 388. It adopted the view that a parent cannot be said to have been damaged by the birth and rearing of a normal, healthy child. It subscribed to the position articulated by the Supreme Court of Wyoming in *Beardsley v. Wierdsma, supra,* 650 P.2d at 293, that "[t]he bond of affection between child and parent, the pride in a child's achievement, and the comfort, counsel and society of a child are incalculable benefits, which should not be measured by some misplaced attempt to put a specific dollar value on a child's life." The Illinois court concluded:

"In a proper hierarchy of values the benefit of life should not be outweighed by the expense of supporting it. Respect for life and the rights proceeding from it are at the heart of our legal system and, broader still, our civilization." 69 Ill.Dec. at 172, 447 N.E.2d at 389.

Other courts which deny recovery for child rearing costs in negligent sterilization cases have declined to require the negligent physician to pay such costs, concluding that to do so would impose an unreasonable burden upon the physician, as it would permit the parents to enjoy all the benefits of parenthood while shifting the entire financial burden to the tortfeasor—a burden out of proportion to the physician's culpability. *See, e.g., Public Health Trust v. Brown; Kingsbury v. Smith; Beardsley v. Wierdsma; White v. United States,* all *supra. See also Berman v. Allan,* 80 N.J. 421, 404 A.2d 8 (1979). Some courts, in denying recovery for rearing costs, have expressed concern over psychological harm done to the child upon learning that her existence was unwanted

and that her parents sued to have the physician provide for her support. *E.g., Boone v. Mullendore* and *Wilbur v. Kerr,* both *supra.* Still other courts have held that child rearing costs in negligent sterilization cases are too speculative and contingent to constitute the basis of an award for damages. *E.g., Coleman v. Garrison; Schork v. Huber; Sorkin v. Lee; Terrell v. Garcia,* all *supra.*

A substantial minority of jurisdictions have permitted parents to recover damages for rearing costs in negligent sterilization cases, offset, however, by the benefits the parents derive from the parent-child relationship. *See University of Ariz. v. Superior Court,* 136 Ariz. 579, 667 P.2d 1294 (1983); *Custodio v. Bauer,* 251 Cal.App.2d 303, 59 Cal.Rptr. 463 (1967); *Stills v. Gratton,* 55 Cal.App.3d 698, 127 Cal. Rptr. 652 (1976); *Ochs v. Borrelli,* 187 Conn. 253, 445 A.2d 883 (1982); *Troppi v. Scarf,* 31 Mich.App. 240, 187 N.W.2d 511 (1971); *Sherlock v. Stillwater Clinic,* 260 N.W.2d 169 (Minn.1977); *Rivera v. State,* 94 Misc.2d 157, 404 N.Y.S.2d 950 (Ct.Cl.1978); *Bowman v. Davis,* 48 Ohio St.2d 41, 356 N.E.2d 496 (1976); *Hartke v. McKelway,* 707 F.2d 1544 (D.C.Cir.1983), *cert. den.,* —— U.S. ——, 104 S.Ct. 425, 78 L.Ed.2d 360 (applying District of Columbia law). *See also Robak v. United States,* 658 F.2d 471 (7th Cir.1981) (applying Alabama law) *but see Boone v. Mullendore,* 416 So.2d 718 (Ala.1982), reaching the opposite result. *See also* Annot., *Medical Malpractice, and Measure And Element of Damages, In Connection With Sterilization Or Birth Control Procedures,* 27 A.L.R.3d 906 (1969).

These cases have considered but rejected the various reasons given by those courts which deny recovery of child rearing costs.[3] *University of Ariz. v. Superior Court, supra,*

---

**3.** These cases are based, in part, upon recognition of the so-called "benefits rule" contained in the Restatement (Second) of Torts § 920 (1979), which states: "When the defendant's tortious conduct has caused harm to the plaintiff or to his property and in so doing has conferred a special benefit to the interest of the plaintiff that was harmed, the value of the benefit conferred is considered in mitigation of the damages, to the extent that this is equitable."

is the most recent case enunciating the minority view. There, the Arizona Supreme Court, applying fundamental tort and damage principles, concluded that the parents of a healthy but unplanned child sustained some damage from the unwanted procreation resulting from the negligence of the operating physician. The court recognized that in some cases the benefits which the parents will receive from having a normal child will outweigh any loss which the parents might incur in rearing and educating the child. But, the court said, "we think it unrealistic that [that] is true in all cases ... [because there are] many situations in which for either financial or emotional reasons, or both, the parents are simply unable to handle another child and where it would be obvious that from either an economic or emotional perspective—or both—substantial damage has occurred." 667 P.2d at 1298. The court said that while it shared the belief that in many cases the intangible and invaluable benefits of parenthood will outweigh the mere monetary burdens imposed upon the parents, it could not decide cases based on that sentiment alone; rather, it said that the court was not at liberty "to impose our views of morality by deciding cases on the basis of personal emotion and sentiment." *Id.* The court's function, it said, was "to leave the emotion and sentiment to others and attempt to examine the problem with logic and by application of the relevant principles of law." *Id.* at 1299. In so doing, the court stated that "in most cases the family can and will adjust to the birth of the child, even though they had not desired to have it, [but] ... there are cases where the birth of an unplanned child can cause serious emotional or economic problems to the parents." *Id.* In rejecting the majority rule that rearing costs can never be a compensable element of damage in a negligent sterilization case, the Arizona court determined that the cost of rearing the child is a foreseeable consequence of the physician's negligence and a compensable element of the damages formulation. It held that the preferable rule was to permit the trier of fact "to consider both pecuniary and non-pecuniary elements of damage

which pertain to the rearing and education of the child . . . [offset by] the pecuniary and non-pecuniary benefits which the parents will receive from the parental relationship with the child." *Id.* The court said:

> "A jury verdict based on knowledge of all relevant circumstances is a better reflection of whether real damage exists in each case than can be obtained from use of any abstract, iron-clad rule which some courts would adopt and apply regardless of the circumstances of the particular case."

In determining the extent of injury suffered by the parents as a result of the negligent sterilization, the court said that the reason given by the parents for seeking the procedure was the most relevant consideration for ascertaining whether they were actually damaged by the subsequent birth, *i.e.,* was the sterilization sought for economic, genetic or therapeutic reasons. Where, for example, the parents sought sterilization to avoid giving birth to a genetically defective child, and a normal child was born, the court indicated that the jury could determine that the birth was a blessing resulting in no economic injury to the parents. Finally, the court said that its decision was based on uniform rules of damage applicable to all tort cases, *viz,* that a wrongdoer is accountable for all damages which may have been caused by the tortious misconduct and all costs which the victim may sustain as a result of the tort.

The Supreme Court of Connecticut, expressing similar views in *Ochs v. Borrelli,* 187 Conn. 253, 445 A.2d 883 (1982), observed that while "raising a child from birth to maturity is a costly enterprise, and hence injurious, . . . it is an experience that abundantly recompenses most parents with intangible rewards." 445 A.2d at 885. Nevertheless, the court said it did not affront public policy to recognize these costs and there is "no inconsistency in our view that parental pleasure softens but does not eradicate economic reality." *Id.* at 885–86. The court thus rejected the public policy argument that the birth of a normal child is always a blessing to its parents which, as a matter of law, totally

offsets the added economic burden. It applied the "benefits rule," requiring that the costs of raising the unplanned child be offset by the benefits conferred upon the parents by having and rearing the child to majority. *Hartke v. McKelway,* 707 F.2d 1544 (D.C.Cir.1983), concluded that the minority view represents "the course of greater justice." *Id.* at 1552. It advanced the view that "when a couple has chosen not to have children, or not to have any more children, the suggestion arises that for them, at least, the birth of a child would not be a net benefit . . . [a] choice . . . the courts are required to respect . . . ." *Id.*

The cases on both sides of the issue have been analyzed in depth by commentators in a number of scholarly law review articles and notes. *See, e.g.,* Comment, *Recovery Of Childrearing Expenses in Wrongful Birth Cases: A Motivational Analysis,* 32 Emory L.J. 1167 (1983); Comment, *Judicial Limitations on Damages Recoverable for the Wrongful Birth of a Healthy Infant,* 68 Va.L.Rev. 1311 (1982); Note, *Wrongful Birth: A Child Of Tort Comes Of Age,* 50 U.Cin. L.Rev. 65 (1981); Comment, *Wrongful Birth Damages: Mandate And Mishandling By Judicial Fiat,* 13 Val.U.L.Rev. 127 (1978); Kashi, *The Case Of The Unwanted Blessing: Wrongful Life,* 31 U.Miami L.Rev. 1409 (1977); Comment, *Wrongful Conception: Who Pays for Bringing Up Baby?,* 47 Fordham L.Rev. 418 (1978); Comment, *Liability for Failure of Birth Control Methods,* 76 Colum.L.Rev. 1187 (1976); Note, *Wrongful Birth in the Abortion Context,* 53 Den.L.J. 501 (1976); Note, *Recovery of Child Support For "Wrongful Birth,"* 47 Tul.L.Rev. 225 (1972); Comment, *Pregnancy After Sterilization: Causes of Action For Parent And Child,* 12 J.Fam.L. 635 (1973). *See also* 3 M. Minzer *et al., Damages in Tort Actions,* § 18.10–.23 (Wrongful Birth) (1982).

## IV.

■ In a tort action for negligence in Maryland the plaintiff may recover "not only for the consequences which have actually and naturally resulted from the tort, but also for those which may certainly or reasonably and probably result

therefrom as proximate consequences, but not for consequences which are speculative or conjectural." *Adams v. Benson,* 208 Md. 261, 270, 117 A.2d 881 (1955); *Mt. Royal Cab Co. v. Dolan,* 166 Md. 581, 171 A. 854 (1934). Otherwise stated, it is the general rule of damages, applicable in tort actions in Maryland, that a plaintiff may recover only those damages that are affirmatively proved with reasonable certainty to have resulted as the natural, proximate and direct effect of the tortious misconduct. *Empire Realty Co. v. Fleisher,* 269 Md. 278, 305 A.2d 144 (1973); *McAlister v. Carl,* 233 Md. 446, 197 A.2d 140 (1964); *Plank v. Summers,* 205 Md. 598, 109 A.2d 914 (1954). Our cases and the Restatement (Second) of Torts § 918 (1979) recognize the doctrine of "avoidable consequences" in tort actions—the duty to minimize damages—denying recovery of any damages that could have been avoided by reasonable conduct on the part of the plaintiff. *Rogers v. Frush,* 257 Md. 233, 262 A.2d 549 (1970); *Hendler Creamery Co. v. Miller,* 153 Md. 264, 138 A. 1 (1927); *Groh v. South,* 119 Md. 297, 86 A. 1036 (1913). The "benefits rule" of the Restatement (Second) of Torts § 920, applied by most jurisdictions which permit recovery of child rearing costs in negligent sterilization cases, has also been recognized in a civil action for damages in Maryland. *See Levi v. Schwartz,* 201 Md. 575, 585, 95 A.2d 322 (1953), where the Court observed "that, as a general rule, where the defendant's tortious action has caused damage to the plaintiff's property, but in so doing has also conferred a special benefit upon the property, the value of the benefit may be considered in mitigation of damages, where that is equitable."

These fundamental principles are manifestly applicable to a medical malpractice action in Maryland involving, as here, a suit by parents for money damages from a physician for the negligent performance of a sterilization operation. We reject the proposition that as a matter of law and public policy no legally cognizable claim for child rearing damages can ever arise in such cases where the unplanned child is born normal and healthy. To adopt such a policy and rule of

law would be to subject a physician to liability for the direct, foreseeable and natural consequences of all negligently performed operations except those involving sterilization—a result, we think, completely at odds with reason.  That the public policy of Maryland may foster the development and preservation of the family relationship does not, in our view, compel the adoption of a per se rule denying recovery by parents of child rearing costs from the physician whose negligence has caused their expenditure.  In other words, it is not to disparage the value of human life and the societal need for harmonious family units to protect the parents' choice not to have children by recognizing child rearing costs as a compensable element of damages in negligent sterilization cases.  We, therefore, decline to follow the majority rule of those jurisdictions which have held that in all cases, without regard to the circumstances, the benefits to the parents from the birth of a healthy child always outweigh child rearing costs and thus result in no injury or damage to the parents.  Instead, we align ourselves with those jurisdictions which permit the trier of fact to consider awarding damages to parents for child rearing costs to the age of the child's majority, offset by the benefits derived by the parents from the child's aid, society and comfort.

As the commentators point out, the injury to the parents of a normal child does not reside in the product of the negligent act, *i.e.,* the child itself;  damages are not sought on the child's behalf in such cases.  Nor do the claimed damages have any relation to the child's value or worth vis-à-vis the expenditures necessary to raise her.  The parents seek damages, not because they do not love and want to keep the unplanned child, but because the direct, foreseeable and natural consequences of the physician's negligence has forced upon them burdens which they sought and had a right to avoid by submitting to sterilization.  In this regard, the assessment of damages associated with the healthy child's birth, if any, should focus upon the specific interests of the parents that were *actually* impaired by the physician's negligence, *i.e.,* was the sterilization sought for

reasons that were (a) genetic—to prevent the birth of a defective child, or (b) therapeutic—to prevent harm to the mother's health or (c) economic—to avoid the additional expense of raising a child. *See, e.g., Hartke v. McKelway, supra,* 707 F.2d at 1553–54; *University of Ariz. v. Superior Court, supra,* 667 P.2d at 1300–01; Comment, 32 Emory L.J., *supra,* at 1189–97.

## V.

■ The public policy which underlies Maryland's Wrongful Death Act does not, as Dr. Jones suggests, preclude recognition of child rearing costs as a compensable element of damages in this case. That statute created a cause of action where none formerly existed for damages suffered by a decedent's next of kin. While the act did not expressly limit recovery to pecuniary losses, our cases declined to recognize solatium damages until, by ch. 352 of the Acts of 1969, a new cause of action was created to permit recovery of such damages in cases involving death of a spouse or a minor child. *See Morrell v. Williams,* 279 Md. 497, 366 A.2d 1040 (1976); *Wittel v. Baker,* 10 Md.App. 531, 272 A.2d 57 (1970). It is upon this premise that Dr. Jones advances the notion that specific statutory authority is an essential prerequisite to recovery of damages in any case which seeks "to place a dollar value on a person's life." Damages such as child rearing costs, offset by the benefits flowing from the parent-child relationship are, according to Dr. Jones, simply too unquantifiable to be recoverable, at least in the absence of legislation. In a similar vein, Dr. Jones invites attention to *Rhone v. Fisher,* 224 Md. 223, 167 A.2d 773 (1961), where we concluded in a negligence action that no recovery was permissible, as a separate element of damages, for the shortening of one's life expectancy. He also points to *McAlister v. Carl,* 233 Md. 446, 197 A.2d 140 (1964), where in a similar action we declined to permit a plaintiff to recover damages based upon her having to give up an intended occupation.

The child rearing costs here in issue are neither too unquantifiable nor too speculative to deny their recovery under settled rules applied by the cases. The computation of such costs requires a routine calculation of reasonably foreseeable expenses that will be incurred by the parents to maintain, support and educate the child to majority age. Such calculations are based on well-recognized economic factors regularly made by actuaries for estate planners and insurance companies; indeed, the expenses associated with raising a child are well appreciated by the average citizen through firsthand experience. *See Sherlock v. Stillwater Clinic, supra; Troppi v. Scarf, supra; Rivera v. State, supra.* The economist demographer's testimony in this case as to the costs of raising Juanita was based on standard economic projections; his calculations took into consideration the employment and earning capacity of the Malinowskis, the expenditures to be made, inflation, the consumer price index and other relevant economic criteria.

The primary area of complexity with respect to the damage calculations in this case focuses upon the offsetting benefits rule which requires the jury to mitigate economic damages by weighing them against the worth of the child's companionship, comfort and aid to the parents. The jury must assess these benefits in light of the circumstances of the particular case under consideration, taking into account, among other things, family size and income, age of the parents and other relevant factors in determining the extent to which the birth of the child represents a benefit to the parents. *Troppi, supra,* 187 N.W.2d at 519. Similar computations are required to be made in wrongful death cases under § 3–904(d) of the Courts Article, *i.e.,* the jury is required to assess damages, *inter alia,* for "loss of society, companionship, comfort, protection, marital care, parental care, filial care, attention, advice, counsel, training, guidance, or education where applicable." That these items of damage were not originally recoverable in wrongful death actions, but were only made so by statute, does not mean that similar items, calculated as offsetting benefits in deter-

mining the ultimate award of consequential damages, are not, absent a statute, appropriately measurable and recoverable in a common law malpractice action based on negligence. To so hold is not to depart from the principles of *Rhone v. Fisher* and *McAlister v. Carl,* both *supra;* those cases are plainly distinguishable from that now before us. And, as earlier observed, no public policy considerations inherent in the Wrongful Death Act, or in any other statute or constitutional provision, compel us to adopt a rule immunizing physicians from consequential child rearing damages associated with the negligent performance of a sterilization operation.[4] Manifestly, family planning is not against the public policy of Maryland. Indeed, as stated in *Troppi v. Scarf, supra,* 187 N.W.2d at 516, tens of millions of couples use contraceptives daily to avoid pregnancy and these people "express the sense of the community."[5]

In the final analysis, therefore, we share the view so well expressed in *University of Ariz. v. Superior Court, supra,* 667 P.2d at 1301:

> "By allowing the jury to consider the future costs, both pecuniary and non-pecuniary, of rearing and educating the child, we permit it to consider all the elements of damage on which the parents may present evidence. By permit-

---

**4.** Declaration of the public policy of the State is normally the function of the legislative branch of government; in discerning that policy, courts consider, as a primary source, statutory and constitutional provisions. *Felder v. Butler,* 292 Md. 174, 438 A.2d 494 (1981); *Adler v. American Standard Corp.,* 291 Md. 31, 432 A.2d 464 (1981).

**5.** Some courts have held that to bar recovery, as a matter of law or public policy, of the costs of raising a child following a negligently performed sterilization would be constitutionally impermissible. These courts reason that individuals have a constitutional right to limit the size of their families through the use of contraceptives in the marital relationship. *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), or through abortion under certain conditions, *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). *See, e.g., Ochs v. Borrelli,* 187 Conn. 253, 445 A.2d 883 (1982); *Bowman v. Davis,* 48 Ohio St.2d 41, 356 N.E.2d 496 (1976); *Sherlock v. Stillwater Clinic,* 260 N.W.2d 169 (Minn.1977); *Troppi v. Scarf,* 31 Mich.App. 240, 187 N.W.2d 511 (1971); 68 Va.L.Rev., *supra,* at 1317.

ting the jury to consider the reason for the procedure and to assess and offset the pecuniary and non-pecuniary benefits which will inure to the parents by reason of their relationship to the child, we allow the jury to discount those damages, thus reducing speculation and permitting the verdict to be based upon the facts as they actually exist in each of the unforeseeable variety of situations which may come before the court. We think this by far the better rule. The blindfold on the figure of justice is a shield from partiality, not from reality."

## VI.

In finding no error in the jury instructions, we are not unmindful of Dr. Jones' contention that the trial court erred in instructing the jury that, in calculating damages, it was not to consider that Mrs. Malinowski refused to submit to an abortion or that the Malinowskis declined to place Juanita for adoption. He suggests that under the doctrine of avoidable consequences such a course of action to mitigate damages was required.

Most courts which have considered the question have determined, as a matter of law, that neither course of action would be reasonable and consequently is not required. *See University of Ariz. v. Superior Court, supra; Sherlock v. Stillwater Clinic, supra; Troppi v. Scarf, supra; Rivera v. State, supra;* M. Minzer, *et al., supra,* § 18.10 and cases there cited. *See also Schork v. Huber, supra,* 648 S.W.2d at 866 (Leibson, J., dissenting): "The best interest of the child, and the natural instincts of the parent, make it unreasonable to require parents to submit the child in the womb to abortion, or the child in the crib to adoption." We agree.

Child rearing expenses in this case being the direct, natural and foreseeable consequences of Dr. Jones' negligence, we do no more today than apply traditional negligence and damage principles in affirming the judgment below. As stated in *Sherlock v. Stillwater Clinic, supra,* 260 N.W.2d at

175, our conclusion "is at best a mortal attempt to do justice in an imperfect world."

JUDGMENT AFFIRMED, WITH COSTS.