## CAROLE BURKE & another[1] *vs.* ELLIOT RIVO.

Middlesex. September 13, 1989. - March 1, 1990.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*Negligence*, Causing birth of child, Doctor, Medical malpractice. *Medical Malpractice*, Contract with doctor. *Contract*, With doctor. *Damages*, Birth of child, Child-rearing expenses, Future damages. *Public Policy*.

In an action by parents against a physician asserting tort and contract claims arising from the birth of a normal and healthy, but unwanted, child after the physician had performed a sterilization procedure which the mother had sought for reasons founded on economic or financial considerations, the parents were to be allowed recovery, as one component of their damages, of the cost of rearing the child to adulthood, offset by the benefit, if any, that the parents receive or will receive from having the child. [766-773] O'CONNOR, J., with whom NOLAN and LYNCH, JJ., joined, dissenting.

CIVIL ACTION commenced in the Superior Court Department on August 21, 1987.

A question of law was reported to the Appeals Court by *Hiller B. Zobel*, J. The Supreme Judicial Court transferred the case on its own initiative.

*Nancy L. Dreher* (*Allan Green* with her) for the plaintiffs.
*John V. Woodard* for the defendant.

WILKINS, J. A judge in the Superior Court reported to the Appeals Court pursuant to Mass. R. Civ. P. 64, 365 Mass. 831 (1974), the question of the proper measure of damages recoverable by the parents of a normal, healthy child who was conceived and born (1) following the defendant physician's alleged negligent performance of a sterilization procedure on the mother, and (2) following the physician's alleged

---

[1] Timothy Burke.

guarantee that the sterilization procedure would prevent any future pregnancy. The case, which we transferred here on our own motion, presents an issue of first impression.

The parties entered into a statement of agreed facts in order to provide a basis for the report of the question of law concerning damages. Many of the so-called statements are recitations of the plaintiffs' allegations, not agreements as to facts. The parties have not agreed "as to all the material facts" in the case (rule 64), and thus a report of the case as one in which all material facts were established was not appropriate. The statement of agreed facts does not, for example, resolve the issue of liability on either the medical malpractice claim or on the guarantee claim.

We shall nevertheless answer the reported question, which is set out in the margin,[2] because in a memorandum the judge has announced his view that certain items of damage would be recoverable and others would not be. The judge has thus in effect made an interlocutory ruling on what items of damage he would permit the plaintiffs to recover and has reported the propriety of that ruling pursuant to the second sentence of rule 64.

In December, 1983, the plaintiff Carole Burke met with the defendant physician to discuss her desire not to have more children. The Burke family was experiencing financial difficulties. She wanted to return to work to support her family and to fulfil her career goals.[3] The Burkes assert that the defendant recommended that Carole undergo a bipolar cau-

___

[2]The judge reported the question: "What is the measure of damages in an action claiming (a) breach of a guarantee that a surgical procedure would forever prevent pregnancy; and (b) negligence in performing that procedure, where the child born as a result of the pregnancy was in every way normal and healthy?"

The question assumes that the child was born in every way normal and healthy. That fact is not set forth in the statement of agreed facts. We shall assume it to be true, without suggesting that it is an important consideration in answering the reported question.

[3]It is alleged, but not agreed, that over a period of six years Carole had given birth to three children and had suffered a miscarriage and that the Burkes did not want to have any more children.

terization procedure and that he guaranteed that she would not again become pregnant if she did so. In February, 1984, the defendant performed a laparoscopic bilateral tubal ligation by bipolar cauterization.

On June 25, 1985, a pregnancy test confirmed that Carole was pregnant. On February 12, 1986, she give birth to a fourth child, and the next day she underwent a second sterilization procedure, known as bilateral salpingectomy. A pathology report showed that there had been a recanalization of the left fallopian tube. The Burkes assert that, if the defendant had told Carole of the risk of recanalization, however small, she would initially have selected a different sterilization procedure.

The judge has only reported questions concerning damages. He has presumably concluded that a physician may properly be held liable if his negligent performance of a sterilization procedure permits conception. Presumably the judge also accepts as a valid potential basis of liability that, as alleged in the complaint, the defendant negligently failed to advise the Burkes of the risk that the operation might not achieve its purpose. The matters of liability are, however, not before us, and remain to be proved.

We do, however, disagree with the defendant's argument that we need not answer the question. We reject his arguments that in Massachusetts there should be no liability for negligently performing a sterilization procedure when the result is the conception of a child; no liability for negligently failing to advise a patient of the risks of conceiving a child following a particular sterilization operation (where the patient, properly informed, would have selected a different and more certain sterilization operation); and no liability for breach of a guarantee that following a sterilization procedure there would be no further pregnancy.

The great weight of authority permits the parents of a normal child born as a result of a physician's negligence to recover damages directly associated with the birth (sometimes including damage for the parents' emotional distress), but courts are divided on whether the parents may recover the

economic expense of rearing the child. See *Boone* v. *Mullendore*, 416 So. 2d 718, 721 (Ala. 1982) (damages include physical pain and suffering and mental anguish of mother, husband's loss of consortium, and medical expenses of pregnancy, but not child-rearing expenses); *Wilbur* v. *Kerr*, 275 Ark. 239, 244 (1982) (all "proper damages" connected with failed vasectomy and unwanted pregnancy recoverable, but for reasons of public policy not expenses of rearing child); *Coleman* v. *Garrison*, 349 A.2d 8, 11 n.5, 13-14 (Del. 1975) (pregnancy-related damage allowed below and not challenged on appeal; no liability for rearing and educating child); *Flowers* v. *District of Columbia*, 478 A.2d 1073, 1074, 1077-1078 (D.C. 1984) (recovery of medical expenses, pain and suffering, and lost wages during pregnancy; wages lost after birth until mother returned to work; and cost of a properly performed tubal litigation, allowed below and not challenged on appeal; child-rearing costs not recoverable); *Public Health Trust* v. *Brown*, 338 So. 2d 1084, 1085 (Fla. Dist. Ct. App. 1980) (damages for medical expenses, lost wages, and pain and suffering caused by unwanted pregnancy not appealed; reasonable cost of rearing child offset by the value of the child's companionship not recognized); *Cockrum* v. *Baumgartner*, 95 Ill. 2d 193, 200-201, cert. denied, 464 U.S. 846 (1983) (child-rearing expenses not recoverable); *Nanke* v. *Napier*, 346 N.W.2d 520, 522 (Iowa 1984) (same); *Schork* v. *Huber*, 648 S.W.2d 861, 863 (Ky. 1983) (same); *Macomber* v. *Dillman*, 505 A.2d 810, 813 (Me. 1986) (medical expenses of pregnancy and sterilization, mother's pain and suffering, mother's lost earnings, husband's loss of consortium, recoverable, but child-rearing costs not recoverable); *Kingsbury* v. *Smith*, 122 N.H. 237, 242-243 (1982) (recovery limited to medical expenses, cost of sterilization, pain and suffering of the pregnancy, mother's lost wages, husband's loss of consortium); *Mason* v. *Western Pa. Hosp.*, 499 Pa. 484, 486-487 (1982) (tort and contract recovery for medical expenses and lost wages related to prenatal care, delivery, and postnatal care, and associated pain and suffering; no recovery for financial and emotional costs

of child-rearing); *Smith* v. *Gore,* 728 S.W.2d 738, 751
(Tenn. 1987) (allowing recovery for medical expenses, recovery, delivery, pain and suffering, and emotional distress during pregnancy but not child-rearing costs); *McKernan* v. *Aasheim,* 102 Wash. 2d 411, 419-421 (1984) (pain and suffering, loss of consortium, expenses of failed sterilization procedure and childbirth, but not child-rearing expenses, recoverable); *James G.* v. *Caserta,* 332 S.E.2d 872, 876-878 (W. Va. 1985) (medical expenses of unsuccessful sterilization, childbirth, subsequent sterilization operation; wife's pain and suffering; loss of consortium recoverable, but not child-rearing expenses); *Rieck* v. *Medical Protective Co.,* 64 Wis. 2d 514, 518-519 (1974) (no recovery for child-rearing costs); *Beardsley* v. *Wierdsma,* 650 P.2d 288, 292 (Wyo. 1982) (various pregnancy and sterilization related expenses, but not child-rearing expenses, recoverable). Contrast *Szekeres* v. *Robinson,* 102 Nev. 93, 95 (1986) (no tort liability for any expenses incurred as result of allegedly negligent sterilization operation; contract liability for, at least, cost of failed surgery, recognized).[4]

The judge below recognized that damages properly would include the cost of the unsuccessful sterilization procedure and costs directly flowing from the pregnancy: the wife's lost earning capacity; medical expenses of the delivery and care following the birth; the cost of care for the other children while the wife was incapacitated; the cost of the second sterilization procedure and any expenses flowing from that operation; and the husband's loss of consortium. We would add the wife's pain and suffering in connection with the pregnancy and birth and with the second sterilization procedure. We also see no reason why the plaintiffs should not recover for emotional distress they sustained as a result of the unwanted pregnancy. Emotional distress could be the probable consequence of a breach of the duty the defendant owed directly to the plaintiffs. See *Gallagher* v. *Duke Univ.,* 852 F.2d 773, 778-779 (4th Cir. 1988); *Fassoulas* v. *Ramey,* 450

---

[4]Cases allowing the recovery of child-rearing costs are cited below.

So. 2d 822, 823 (Fla. 1984); *Smith* v. *Gore*, 728 S.W.2d 738, 751-752 (Tenn. 1987); *Naccash* v. *Burger*, 290 S.E.2d 825, 831 (Va. 1982).

The principal issue is whether the plaintiffs are entitled, if they establish liability, to the cost of raising their child. Under normal tort and contract principles, that cost is both a reasonably foreseeable and a natural and probable consequence of the wrongs that the plaintiffs allege. The question is whether there is any public policy consideration to which we should give effect to limit traditional tort and contract damages. We conclude that there is none as to parents who have elected sterilization for economic reasons.

Many justifications often relied on for declining to allow recovery of the cost of rearing a healthy child born as a result of a physician's negligence are outstandingly unimpressive. See Note, Judicial Limitations on Damages Recoverable for the Wrongful Birth of a Healthy Infant, 68 Va. L. Rev. 1311, 1315-1323 (1982). The judicial declaration that the joy and pride in raising a child always outweigh any economic loss the parents may suffer, thus precluding recovery for the cost of raising the child (see, e.g., *Boone* v. *Mullendore*, 416 So. 2d 718, 722 [Ala. 1982]), simply lacks verisimilitude. The very fact that a person has sought medical intervention to prevent him or her from having a child demonstrates that, for that person, the benefits of parenthood did not outweigh the burdens, economic and otherwise, of having a child. The extensive use of contraception and sterilization and the performance of numerous abortions each year show that, in some instances, large numbers of people do not accept parenthood as a net positive circumstance. We agree with those courts that have rejected the theory that the birth of a child is for all parents at all times a net benefit. See *Hartke* v. *McKelway*, 707 F.2d 1544, 1551-1552 (D.C. Cir.), cert. denied, 464 U.S. 983 (1983) (construing District of Columbia law before *Flowers* v. *District of Columbia*, 478 A.2d 1073 [D.C. 1984]); *University of Ariz. Health Sciences Center* v. *Superior Court*, 136 Ariz. 579, 583-584 (1983); *Ochs* v. *Borrelli*, 187 Conn. 253, 259-260 (1982); *Sherlock*

*v. Stillwater Clinic,* 260 N.W.2d 169, 175 (Minn. 1977); *McKernan* v. *Aasheim,* 102 Wash. 2d 411, 418 (1984). While we firmly reject a universal rule that the birth of an unexpected healthy child is always a net benefit, we also firmly reject any suggestion that the availability of abortion or of adoption furnishes a basis for limiting damages payable by a physician but for whose negligence the child would not have been conceived. See *University of Ariz. Health Sciences Center* v. *Superior Court,* 136 Ariz. 579, 586 n.5 (1983); *Jones* v. *Malinowski,* 299 Md. 257, 274 (1984); *Sherlock* v. *Stillwater Clinic, supra* at 176.

We are also unimpressed with the reasoning that child-rearing expenses should not be allowed because some day the child could be adversely affected by learning that he or she was unwanted and that someone else had paid for the expense of rearing the child. See *Hartke* v. *McKelway, supra* at 1552 n.8. Courts expressing concern about the effect on the child nevertheless allow the parents to recover certain direct expenses from the negligent physician without expressing concern about harm to the child when the child learns that he or she was unwanted. See, e.g., *Boone* v. *Mullendore,* 416 So. 2d 718, 721-722 (Ala. 1982); *Wilbur* v. *Kerr,* 275 Ark. 239, 244 (1982); *McKernan* v. *Aasheim,* 102 Wash. 2d 411, 421 (1984). The once unwanted child's knowledge that someone other than the parents had been obliged to pay for the cost of rearing him or her may in fact alleviate the child's distress at the knowledge of having been once unwanted. See *Custodio* v. *Bauer,* 251 Cal. App. 2d 303, 325 (1967). In any event, it is for the parents, not the courts, to decide whether a lawsuit would adversely affect the child and should not be maintained. See *University of Ariz. Health Sciences Center* v. *Superior Court,* 136 Ariz. 579, 585 (1983), and cases cited.

We see no validity to the arguments, sometimes made, that the costs of child-rearing are too speculative or are unreasonably disproportionate to the doctor's negligence. See, e.g., *Schork* v. *Huber,* 648 S.W.2d 861, 863 (Ky. 1983); *James G.* v. *Caserta,* 332 S.E.2d 872, 878 (W. Va. 1985);

*Rieck* v. *Medical Protective Co.*, 64 Wis. 2d 514, 519 (1974). The determination of the anticipated costs of child-rearing is no more complicated or fanciful than many calculations of future losses made every day in tort cases. If a physician is negligent in caring for a newborn child, damage calculations would be made concerning the newborn's earning capacity and expected medical expenses over an entire lifetime. The expenses of rearing a child are far more easily determined. If there is any justification for denying recovery of normal tort damages in a case of this character, it is not that the cost of rearing a child is incapable of reasonable calculation or is too great to impose on a negligent physician.

A substantial number of jurisdictions have allowed recovery of the cost of rearing a normal child to adulthood, offset, however, by the benefits that the parents receive in having a normal, healthy child. See *University of Ariz. Health Sciences Center* v. *Superior Court*, 136 Ariz. 579, 584-585 (1983); *Ochs* v. *Borrelli*, 187 Conn. 253, 259-260 (1982); *Jones* v. *Malinowski*, 299 Md. 257, 270-271 (1984); *Sherlock* v. *Stillwater Clinic*, 260 N.W.2d 169, 175-176 (Minn. 1977). See also *Hartke* v. *McKelway*, 707 F.2d 1544, 1552 (D.C. Cir. 1983) ("allowing the plaintiff to prove that raising a child constitutes damage is the course of greater justice"). Such a balancing by the trier of fact requires a comparison of the economic loss of child-rearing with the emotional gains of having a normal, healthy child (converted into a dollar value). These courts have thought the comparison appropriate under the general principle expressed in Restatement (Second) of Torts § 920 (1979).[5] A few courts have thought that, because the benefit conferred did not affect the economic interest that was harmed, no mitigation of the cost of child-rearing should be recognized. See discussion in *Hartke* v. *McKelway*, *supra* at 1557-1558 n.16.

---

[5]Section 920 provides: "When the defendant's tortious conduct has caused harm to the plaintiff or to his property and in so doing has conferred a special benefit to the interest of the plaintiff that was harmed, the value of the benefit conferred is considered in mitigation of damages, to the extent that this is equitable."

If the parents' desire to avoid the birth of a child was founded on eugenic reasons (avoidance of a feared genetic defect) or was founded on therapeutic reasons (concern for the mother's health) and if a healthy, normal baby is born, the justification for allowing recovery of the cost of rearing a normal child to maturity is far less than when, to conserve family resources, the parents sought unsuccessfully to avoid conceiving another child. See *University of Ariz. Health Sciences Center* v. *Superior Court*, 136 Ariz. 579, 585 (1983) ("For example, where the parent sought sterilization in order to avoid the danger of genetic defect, the jury could easily find that the uneventful birth of a healthy, non-defective child was a blessing rather than a 'damage' "); *Jones* v. *Malinowski*, 299 Md. 257, 270-271 (1984) ("the assessment of damages associated with the healthy child's birth, if any, should focus upon the specific interests of the parents that were *actually* impaired by the physician's negligence, i.e., was the sterilization sought for reasons that were (a) genetic — to prevent birth of a defective child, or (b) therapeutic — to prevent harm to the mother's health or (c) economic — to avoid the additional expense of raising a child") (emphasis in original). See also *Hartke* v. *McKelway*, *supra* at 1553-1555, and authorities cited (no recovery of expenses of raising normal child where sterilization was sought solely because of fear of childbirth).

We conclude that, in addition to the recoverable damages described earlier in this opinion, parents may recover the cost of rearing a normal, healthy but (at least initially) unwanted child if their reason for seeking sterilization was founded on economic or financial considerations. In such a situation, the trier of fact should offset against the cost of rearing the child the benefit, if any, the parents receive and will receive from having their child.[6] We discern no reason founded on sound

---

[6]The dissent declares that a factfinder should not engage "in an inquiry concerning the probable value of a child to his or her parents." *Post* at 774 (O'Connor, J., dissenting). The process is not an unacceptably difficult one. Our law recognizes the propriety of measuring the loss to parents in financial terms when a child is injured (G. L. c. 231, § 85X, inserted by St.

public policy to immunize a physician from having to pay for a reasonably foreseeable consequence of his negligence or from a natural and probable consequence of a breach of his guarantee, namely, the parents' expenses in rearing the child to adulthood.

O'CONNOR, J. (dissenting, with whom Nolan and Lynch, JJ., join). I agree that, on adequate proof, a defendant may be held liable to a patient in tort for negligent performance of a sterilization procedure, or for negligently advising a patient concerning the probable effectiveness of a particular procedure compared to others. I agree, too, that a defendant may be held liable to a patient on a contract theory if the defendant's guarantee of a result does not hold true. I do not agree, however, that damages may be assessed on either a tort or contract theory as compensation to anyone for raising and being responsible for a child born after the procedure has taken place or the advice or guarantee has been given. I do not agree that damages may reflect the impact of the birth of a child on parents' or a family's economic situation or mode of life. The view that I take has been embraced by a substantial majority of courts that have dealt with the issue.

This is not a run-of-the-mill medical malpractice case. Involving, as it does, the creation of new human life, it is unique, see *Kingsbury* v. *Smith*, 122 N.H. 237, 243 (1982),

1989, c. 259, § 1 [loss of consortium when a child is seriously injured]), or killed (G. L. c. 229, § 2 [1988 ed.] [loss of "society, companionship, comfort, guidance, counsel, and advice"]). To measure the benefit of having a child is simply the other side of the coin. Numerous courts have reached the same conclusion. See, e.g., *Hartke* v. *McKelway*, 707 F.2d 1544, 1552 n.8 (D.C. Cir. 1983) ("no significant distinction between the task here and the analogous task of fixing damages for wrongful death"); *University of Ariz. Health Sciences Center* v. *Superior Court*, 136 Ariz. 579, 582-583 (1983) ("juries in tort cases are often required to assess just such intangible factors, both emotional and pecuniary, and [we] see no reason why a new rule should be adopted for wrongful pregnancy); *Ochs* v. *Borrelli*, 187 Conn. 253, 260 (1982) (citations omitted) ("We see no basis for distinguishing this case from other tort cases in which the trier of fact fixes damages for wrongful death . . . or for loss of consortium").

and that reality must be recognized in the formulation of a proper rule of damages. Tort law finds its source in social values and ought to promote appropriate public policy. See *Feliciano* v. *Rosemar Silver Co.*, 401 Mass. 141, 142 (1987); *Schofield* v. *Merrill*, 386 Mass. 244, 246-251 (1982); W.L. Prosser & W.P. Keeton, Torts § 3, at 15-17 (5th ed. 1984).

The court concludes that parents who have elected sterilization for economic reasons[1] are entitled, if they establish liability, to the cost of rearing "a normal child to adulthood, offset, however, by the benefits that the parents receive in having a normal, healthy child." *Ante* at 771. I agree, as do most of the relatively few courts that allow recovery of child-rearing costs, that an award of such costs without setting off the value of the child to the parents would be unfair to defendants, and therefore intolerable. However, in my view, it would be equally intolerable for a judge or jury to engage in an inquiry concerning the probable value of a child to his or her parents. The result, in my view, is that child-rearing costs should not be recoverable.

The inquiry would be intolerable because it would require a determination of whether the child represents a loss to his or her parents. Would they be better off if the child had never been born? Is the child worth less than it would cost to raise him or her and, if so, how much less? Even if such an inquiry could lead to a reasoned, and not merely speculative, conclusion, a doubtful proposition, the balancing of costs and benefits treats the child as though he or she were personal property. The very inquiry is inconsistent with the dignity that the Commonwealth, including its courts, must accord to every human life, and it should not be permitted.

The court suggests that such an inquiry would be no different in principle from other inquiries in which we now engage, such as inquiry into parental loss of consortium due to

---

[1]The court appears to consider only parents who have elected sterilization for economic, eugenic, or therapeutic reasons. Clearly, there may be numerous other motivations for submitting to sterilization procedures. It is unclear whether cases brought by such parents come within the rule of damages announced in this decision.

a child's serious impairment from injury, or inquiry into parental loss due to a child's death. I disagree. The policy assumption underlying the assessment of damages for loss of a child's consortium or for a child's death is that a child's life has value and its impairment or termination results in loss to the parents. That assumption is consistent with the respect for human life that ought to be embodied in the public policy of this Commonwealth. The assumption underlying the availability of damages due to a child's birth, however, is that the child's net value to his or her parents, in light of associated costs, is less than nothing. How much less determines the amount of the plaintiff's damages. Surely, sound public policy requires a recognition that injury or death of a child, but not a child's life, represents loss to others.

No further policy reason is needed to reject the rule embraced by the court. Nonetheless, it seems appropriate to consider further, if only briefly, the potentially adverse effect of the newly adopted rule on children and families in this Commonwealth. "It is . . . the policy of this commonwealth to direct its efforts . . . to the strengthening and encouragement of family life for the protection and care of children." G. L. c. 111, § 1 (1988 ed.). That policy is surely not served, indeed it is disserved, by a rule of damages that would require parents, if their litigation is to succeed, to persuade a judge or jury that their child is not worth to them the cost of rearing that child. The Supreme Court of Illinois put it this way: "It can be seen that permitting recovery then requires that the parents demonstrate not only that they did not want the child but that the child has been of minimal value or benefit to them. They will have to show that the child remains an uncherished, unwanted burden so as to minimize the offset to which the defendant is entitled. The court in *Public Health Trust* v. *Brown*, [388 So. 2d 1084, 1086 n.4 (Fla. Dist. Ct. App. 1980)] convincingly noted: 'The adoption of that rule [allowing recovery] would thus engender the unseemly spectacle of parents disparaging the "value" of their children or the degree of their affection for them in open court. It is obvious, whether the conclusion is phrased in

terms of "public policy" [citation] or otherwise, that such a result cannot be countenanced.' " *Cockrum* v. *Baumgartner*, 95 Ill. 2d 193, 202 (1983).

The court states that it is "unimpressed with the reasoning [of several courts] that child-rearing expenses should not be allowed because some day the child could be adversely affected by learning that he or she was unwanted and that someone else had paid for the expense of rearing the child." *Ante* at 770. The court concludes that "it is for the parents, not the courts, to decide whether a lawsuit would adversely affect the child and should not be maintained." *Ante* at 770. I disagree. The State's interest in strengthening and encouraging family life for the protection and care of children is legitimate and strong. *P.B.C.* v. *D.H.*, 396 Mass. 68, 73 (1985). Indeed, it is for the State to determine whether to adopt a rule of damages that would encourage litigation harmful to families — litigation designed to produce the result, ultimately to be discovered by the child, that he or she was supported not by the parents, because they did not want him or her, but by an unwilling stranger.