MARGARET G. MCDONALD *vs.* ROCKLAND TRUST COMPANY.

No. 01-P-1791.

Norfolk. June 12, 2003. - November 6, 2003.

Present: BROWN, LAURENCE, & MCHUGH, JJ.

*Uniform Commercial Code,* Secured creditor, Possession of collateral. *Unjust Enrichment. Contract,* Unjust enrichment. *Consumer Protection Act,* Unfair or deceptive act.

The judge in a civil action correctly determined that the defendant bank's rejection of the plaintiff's plan to inject more working capital into the business of the bank's debtor without using the injection to pay down a loan to the bank (a secured creditor of the debtor) did not constitute the disposal of collateral in a manner that was not commercially reasonable in violation of G. L. c. 106, § 9-504(3), where the bank did not take possession of any of the debtor's assets during the time that it was rejecting the plaintiff's plan, and therefore remained entitled to act as it did in forbearing from enforcing the security agreement subject to conditions upon which the debtor agreed; moreover, the plaintiff failed to identify any specific deficiencies in the bank's postbankruptcy collection of the debtor's accounts receivable that rendered the collection commercially unreasonable. [840-841]

In a civil action arising from a secured interest that the defendant bank had in a debtor who rented an office building from the plaintiff, the judge correctly granted summary judgment in favor of the bank on a claim of unjust enrichment from the bank's alleged continued use, occupancy, and storage of the debtor's inventory in the office building after the debtor had declared bankruptcy and the Bankruptcy Court had ordered the debtor to turn over all of its assets to the bank, where the bank never took possession of the inventory or exercised such dominion or control over the equipment as to constitute constructive possession, and therefore, the plaintiff landlord was required to make her claim for rent, use, or occupancy to the bankruptcy trustee. [841-842]

In a civil action arising from a debt that the plaintiff's son's business owed the defendant bank, the judge properly granted summary judgment in favor of the bank on a claim that the bank had acted in bad faith in violation of G. L. c. 93A, § 11, by pressuring the plaintiff to pay a loan she had not personally guaranteed with her personal funds, where the bank was entitled under a forbearance agreement with the debtor to refuse to authorize rent payments to the plaintiff, which agreement was prepared by the debtor's consultant and continued the debtor's established practice of not paying rent; moreover, the record created no genuine issue of material fact regard-

ing any damage to the plaintiff flowing from the bank's allegedly unfair and deceptive threats or payment disapprovals. [842-843]

CIVIL ACTION commenced in the Superior Court Department on November 24, 1999.

The case was heard by *Patrick F. Brady*, J., on a motion for summary judgment.

*Michael Roitman* for the plaintiff.

*A.W. Phinney, III (Timothy J. Langella* with him) for the defendant.

McHUGH, J. This is an appeal from a summary judgment entered in Superior Court in favor of the defendant Rockland Trust Company (bank) dismissing an action brought against it by Margaret McDonald. In her suit, McDonald asserted claims for violation of G. L. c. 106, § 9-504 (as in effect when the complaint was brought on November 24, 1999); unjust enrichment; and violation of G. L. c. 93A, § 11.[1] We affirm the judgment on all counts.

*Background.* The events leading to McDonald's suit are as follows. McDonald and the bank were creditors of a commercial carpet sales and installation business called J.F. McDonald Company, Inc. (JFM). JFM's chief operating officer was McDonald's son, John, and JFM leased office and other space in a building McDonald owned subject to a mortgage the bank held (the office building).

As a consequence of loans she and her late husband had

---

[1] McDonald's complaint also included a claim for conversion based on her contention that the bank impermissibly took possession of some personal mail addressed to her. The motion judge allowed the bank's motion for summary judgment on that claim because the record contained no evidence of the damages McDonald had suffered as a consequence of the alleged conversion. See *Blais-Porter, Inc.* v. *Simboli*, 402 Mass. 269, 274 (1988). Here, McDonald argues that allowance of the motion on that ground was error because, upon proof of liability, she would have been entitled to an award of nominal damages. It is well settled, however, that we "decline to reverse and remand where . . . only nominal damages could be recovered." *May* v. *Gillette Safety Razor Co.*, 18 Mass. App. Ct. 916, 916 (1984). See *Lakian* v. *Globe Newspaper Co.*, 399 Mass. 379, 384 (1987) ("failure to award nominal damages would not be reversible error"). See also *Buckley* v. *White*, 328 Mass. 653, 654 (1952).

made to JFM, McDonald held a note for $230,750 on which JFM was the obligor. The bank had made loans to JFM totaling $677,900,[2] and those loans were secured by liens on all of JFM's assets. McDonald, JFM, and the bank made a subordination agreement under which McDonald agreed that she would seek no payment on her note until JFM had repaid its debt to the bank in full.

By April of 1996, JFM had encountered financial difficulties, several of which amounted to violations of its loan and security agreements with the bank. As a consequence, the bank declared that JFM's loan was in default[3] and dispatched Wayne Carvalho and Virginia Norkevicius, two of its representatives, to meet with John and JFM's counsel, James Liston. During one of several ensuing meetings, Carvalho and Norkevicius told John that the bank would enforce its right to collect the loans unless JFM engaged a business consultant and restructured its operations. Shortly thereafter, JFM engaged David Billings, a business consultant, and soon entered into two forbearance agreements with the bank, one on May 28, 1996, and the other on June 7, 1996.

In the forbearance agreements, the bank required, among other things, that "all cash on hand [and] all cash received . . . be deposited directly into [JFM's] deposit account . . . at the bank." The agreement also required that JFM use the deposited cash only for payment of expenses listed in a budget Billings had prepared to reflect the "minimum amount [required] for [JFM] to operate during [the forbearance] period." The listed expenses included health insurance, materials, consultant fees, worker's compensation insurance, and payroll, but did not include rent or, despite JFM's objections, taxes. The agreement also stated that any funds in "excess of the amounts required to satisfy the [listed] expenses" would be used in a manner the bank, in its sole discretion, determined.

During the forbearance period, representatives of the bank

---

[2]That amount is the sum of three separate loans, a July 14, 1994, loan of $600,000; a November 30, 1994, loan of $17,900; and a July 25, 1995, loan of $60,000.

[3]The bank sent JFM two formal notices of default, one on April 29, 1996, and the other on May 10, 1996.

visited JFM's office "three or four days a week" and closely supervised JFM's business practices. JFM was required to collect its receivables, deposit the cash into its account with the bank, and call the bank when bills required payment. Payment of each bill was either approved or disapproved at the discretion of the bank. Among the debts for which the bank did not approve payment were rent to McDonald, employment taxes, and certain insurance on equipment. The bank also rejected Billings's proposal that it allow JFM to use for operating capital any additional money McDonald lent the company, rather than apply that money to reduction of JFM's debt. Although McDonald was willing to lend JFM additional sums, she was "not interested" in doing so if the loan proceeds would be used to pay the bank rather than to stabilize JFM.

McDonald alleges that Carvalho's intent during this period, as expressed to Billings, was to pressure McDonald into paying JFM's debt. This pressure took the form of threats to bring criminal charges against John and his brother (the latter of whom, at least, Carvalho believed had stolen some of JFM's assets), threats to force John to become personally liable for unpaid taxes, and continuing to prohibit JFM from making rental payments to her. McDonald does not contend that she succumbed to this pressure and there is no evidence that she spent or invested any money in response to it.

Efforts to salvage JFM were unsuccessful. On June 20, 1996, the company filed a voluntary petition for bankruptcy under Chapter 11 of the United States Bankruptcy Code, an event that triggered the Code's automatic stay provisions. See 11 U.S.C. § 362 (1993). In its petition, JFM stated that it possessed all of its property and assets and that none had been foreclosed, repossessed, or otherwise placed into the hands of a creditor. At the time of its bankruptcy filing, JFM owed McDonald approximately $11,378.90 for unpaid 1995 rent and $9,000 for unpaid rent covering the period from January through May of 1996.

The bank filed a motion for relief from the stay on June 21, 1996. The motion was allowed on July 29, 1996. At that time, the United States Bankruptcy Court directed JFM "to turn-over

possession to [the bank] of all cash collateral . . . upon receipt" and authorized the bank "to exercise its further rights and remedies . . . to take possession of and liquidate [JFM's] collateral."

On August 29, 1996, with McDonald's permission, the bank entered the office building and removed books and loan records. The bank did not, however, touch or remove any of JFM's inventory. In accordance with the security agreement, the bank redirected all incoming mail addressed to JFM to a postal box the bank controlled.

On March 3, 1997, the bank opted to exercise its security rights only as to JFM's accounts receivable and abandoned its security interest in JFM's inventory to the bankruptcy trustee. By February 13, 2001, when the motion for summary judgment was filed in this case, the bank's collection of JFM accounts receivable had reduced the unpaid principal and interest on JFM's loans to approximately $207,000. As a subordinated creditor, McDonald had received no payment on her $230,750 note.

*Discussion.* Based on these events, McDonald first claims that the bank violated G. L. c. 106, § 9-504(3),[4] which requires a secured party to dispose of collateral in a commercially reasonable manner. McDonald alleges that the bank's rejection of Billings's prebankruptcy proposal to allow her to inject more working capital into JFM without using the injection to pay down the bank loan was commercially unreasonable because that rejection did not maximize the value of JFM's collateral. McDonald also alleges that the bank's liquidation of JFM's accounts receivable after July 29, 1996, was commercially unreasonable because the amount the bank collected was significantly less than the face value of the accounts.

The insurmountable difficulty with McDonald's claim regarding rejection of McDonald's plan for injecting capital is that the bank did not take possession of any JFM asset at any point dur-

---

[4]All references to Article 9 of the Uniform Commercial Code, G. L. c. 106, §§ 9-101 et seq., are to the version existing prior to the revision contained in St. 2001, c. 26, § 39.

ing the period in which it was rejecting the plan.[5] The provisions of § 9-504 presuppose that a creditor has exercised its right under § 9-503 to take possession of the collateral after a default. See *Arlington Trust Co.* v. *Caimi*, 414 Mass. 839, 846 (1993) (secured creditor cannot dispose of what it does not possess). But an event of default does not automatically transfer possession to the creditor. See *First Republic Corp. of Am.* v. *BayBank*, 424 Mass. 704, 707 (1997). The creditor therefore remains entitled, for instance, to release its security interest or, as the bank did here, to forbear from enforcing the security agreement subject to conditions upon which the debtor agrees. To be sure, the bank's forbearance agreement gave it substantial control over the manner in which JFM thereafter conducted its business affairs. That control, however, was not the equivalent of possession of the collateral, a fact JFM itself recognized when it noted in its bankruptcy petition that no creditor had taken possession of any of its assets.

McDonald's second basis for claiming a violation of G. L. c. 106, § 9-504, is her assertion that the bank's postbankruptcy collection of JFM's accounts receivable, beginning in August of 1996, was commercially unreasonable. McDonald, however, cites no "specific deficiencies in the [bank's] conduct . . . that render [the collection] commercially unreasonable." *Nadler* v. *BayBank Merrimack Valley, N.A.*, 733 F.2d 182, 184 (1st Cir. 1984). By itself, a difference between the amount recovered during collection and the accounts' value prior to liquidation is insufficient to show the disposition was commercially unreasonable. *Ibid.* See G. L. c. 106, § 9-507(2).[6]

McDonald's second claim, for unjust enrichment, alleges that

[5]We therefore need not consider the novel claim, for which McDonald offers no support, that rejection of a debtor's business plan by a creditor in possession of collateral could somehow amount to an unreasonable disposition of that collateral.

[6]As an alternative to these two arguments, McDonald alleges that the bank violated G. L. c. 106, § 1-203, which provides that "[e]very contract or duty within this chapter imposes an obligation of good faith in its performance or enforcement." As evidence of bad faith, McDonald cites the bank's refusal to authorize JFM to pay rent and employment taxes, and Carvalho's threat to initiate criminal actions against her children. But the vast majority of JFM's debt was embodied in demand notes, and the "good faith" provision of § 1-203 does not apply to a creditor's decision to exercise its express right to

because the bank had a security interest in all of JFM's assets and because the Bankruptcy Court, when it removed the stay, ordered JFM to turn all of its assets over to the bank, the bank is liable to McDonald for continued "use, occupancy [and] storage" of JFM's inventory in the office building.

A virtually identical argument was considered and rejected by the Supreme Judicial Court in *First Republic Corp. of Am.* v. *BayBank,* 424 Mass. at 706. A landlord who is burdened with the inventory of a bankrupt business must make its claim for rent, use, or occupancy to the bankruptcy trustee unless the secured creditor has taken possession of that inventory. *Ibid.* It is evident from the facts of this case that the bank never took possession of the inventory or "exercised such dominion or control [over] the equipment" that it constituted constructive possession. *Leighton* v. *Fleet Bank of Me.,* 634 A.2d 453, 456 (Me. 1993). See Black's Law Dictionary 1163 (6th ed. 1990).

McDonald's final claim alleges the bank acted in "bad faith" in violation of G. L. c. 93A, § 11, by "pressuring her to pay a loan she did not personally guarantee with her personal funds." To support her claim, McDonald again cites the failure to allow rental and tax payments and Carvalho's threat.[7] We are unpersuaded by McDonald's argument.[8]

Addressing first the bank's refusal to authorize rental pay-

---

demand payment of such a note. *Shawmut Bank, N.A.* v. *Miller,* 415 Mass. 482, 486 n.7 (1993). To the extent that good faith may be required in setting the terms of a demand for payment or forbearance thereof, see *id.* at 489, there is no "requirement of commercial reasonableness in the [Uniform Commercial] Code's definition of 'good faith,' " *McCarthy, Kenney & Reidy, P.C.* v. *First Natl. Bank of Boston,* 402 Mass. 630, 635 (1988), and there is no evidence that criminal charges were ever filed or that the taxes were never paid.

[7]McDonald also alleged that the bank's refusal to pay use and storage charges was in bad faith. Because the bank was not liable for those charges, however, its failure to pay them was no manifestation of bad faith. Similarly, because we find no merit in McDonald's argument that the bank unreasonably disposed of JFM's assets, that argument does not support her c. 93A claim.

[8]Although not briefed by the parties, it is worth noting that McDonald's standing to bring a claim under G. L. c. 93A, § 11, based on the bank's alleged bad faith in pressuring her to pay a loan she did not personally guarantee, is not altogether clear. To fall within the ambit of § 11, McDonald must at least have conducted "some transaction in a business context." *Kerlinsky* v. *Fidelity & Deposit Co. of Md.,* 690 F. Supp. 1112, 1117 (D. Mass. 1987), aff'd, 843 F.2d 1383 (1st Cir. 1988), citing *International Fid. Ins. Co.* v.

ments, we note that the bank was entitled to do so because rent was not included in the list of budgeted expenses in the forbearance agreement. To claim successfully that a bank's lawful enforcement of a contract nonetheless constituted an unfair or deceptive practice, McDonald must show the bank's conduct was "obviously against public policy," *Kattar* v. *Demoulas*, 433 Mass. 1, 14 (2000), or had an "an extortionate quality that [gave] it the rancid flavor of unfairness." *Atkinson* v. *Rosenthal*, 33 Mass. App. Ct. 219, 226 (1992). In this case, McDonald can do neither. The list was prepared and proposed by JFM's own business consultant, and nonpayment of rent to McDonald simply continued a JFM practice that had been occurring for a considerable period of time before the forbearance agreement was signed.

The two other bases for McDonald's c. 93A claim — the bank's refusal to authorize JFM to pay employment taxes and Carvalho's threat — are equally unhelpful to her. McDonald's successful prosecution of a claim under G. L. c. 93A, § 11, requires proof of a causal connection between the bank's conduct and damage to her. See *Massachusetts Farm Bureau Fedn., Inc.* v. *Blue Cross of Mass., Inc.*, 403 Mass. 722, 730-731 (1989). Nothing in the record suggests that McDonald paid the taxes JFM was precluded from paying or that she succumbed to any threats by making any other expenditure. The record, in sum, creates no genuine issue of material fact regarding any damage to McDonald flowing from the bank's allegedly unfair and deceptive threats or payment disapprovals.[9]

*Judgment affirmed.*

---

*Wilson*, 387 Mass. 841, 852 (1983). Whether claims under G. L. c. 93A, § 11, are available to any third party with the potential to pay a debtor's bills is a question demanding careful consideration that the facts of this case do not require us to undertake.

[9]We do not approve or endorse the bank's alleged conduct or even suggest that that conduct, if accompanied by proof of damages, is incapable of supporting a claim under G. L. c. 93A, § 11. We decide the case simply on the absence of evidence of damages.